Gary W. PETERSEN, Appellant,

v.

STATE of Alaska, Appellee.

Bruce C. LARSON, Appellant,

v.

STATE of Alaska, Appellee.

Donald G. COLBRY, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–5724, A–5834 and A–5893.

Court of Appeals of Alaska.

Dec. 20, 1996.

G. Blair McCune, Assistant Public Defender, and John B. Salemi, Public Defender,

Anchorage, for appellants Petersen and Colbry.

Randall W. Patterson, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant Larson.

W. H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for appellees in file Nos. A–5724 and A–5834 (Petersen and Larson).

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for appellee in file No. A–5893 (Colbry).

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

In these consolidated appeals, the three defendants challenge the constitutionality of Alaska's stalking statutes, AS 11.41.260 and AS 11.41.270. As explained below, we conclude that the statutes do not violate the Constitution, and thus we affirm the defendants' convictions.

### Facts of the Case: Petersen

In 1989, Gary W. Petersen began receiving massage therapy at the Gatekey health center in Anchorage. One of the therapists who treated Petersen was R.H., an apprentice therapist at the health center. Eventually, Petersen chose R.H. as his exclusive massage therapist. Later in 1989, R.H. completed her apprenticeship at Gatekey and took a job as a massage therapist at the Kanady Chiropractic Clinic. To continue receiving massage treatments from R.H., Petersen began to patronize the Kanady Clinic. By the spring of 1990, Petersen began making frequent appearances at the Kanady Clinic, sometimes showing up to visit with R.H. even when he did not have an appointment.

In June 1990, R.H. married. She sent Petersen an invitation to the wedding, but he did not attend. In late 1990, R.H. invited Petersen to a New Year's Eve party at her home. In conjunction with this invitation, R.H. provided Petersen with her home telephone number and a map showing directions to her home. Petersen made a brief appearance at the party and then left.

On one occasion in 1991, Petersen showed up unexpectedly at R.H.'s home, telling her he had come by because he was "worried" about her. R.H. was uncomfortable with Petersen's uninvited visit, so she told him that she was busy. Petersen left.

Several times during the winter and spring of 1991, Petersen showed up at the Kanady Clinic just as R.H. was leaving work. According to R.H., Petersen "invited himself" to join her evening activities on those occasions (viewing ice sculptures, going to see a movie, going to a folk festival, eating dinner at a restaurant). R.H. felt "annoyed [and] intruded upon" because Petersen kept showing up at the clinic as she left work, but she allowed Petersen to come along on outings because she "felt sorry for him".

However, R.H. grew increasingly uncomfortable as Petersen began to "show up everywhere". Petersen began visiting the Kanady Clinic several times a day, generally with no appointment. R.H. also began to see Peterson at fairs and other public places, and she often found him at the Carrs grocery in Eagle River. (This store was near R.H.'s house, but Petersen lived in Anchorage.)

R.H. began telling relatives and friends of her discomfort with Petersen's behavior. She informed her employer, Dr. Kanady, that she no longer wished to see Petersen as a patient because "his behavior was inappropriate". R.H. eventually confronted Petersen, telling him that his behavior was making her uncomfortable and that she wanted him to start seeing a different therapist at the clinic. Dr. Kanady also met with Petersen; Kanady told Petersen that R.H. was no longer comfortable serving as his therapist, and he referred Petersen to a different massage therapist at the clinic. Despite these conversations, R.H. continued to encounter Petersen at public events and observe him outside the clinic.

On June 1, 1991, R.H. attended a rodeo with her children. She saw Petersen as she entered the gate, so she sat at the far end of

the bleachers to avoid him. Petersen came over to where R.H. and her children were sitting; he asked if he could sit with them. R.H. told Petersen he could not—that she didn't want to have any contact with him, and that she wanted him to leave. Petersen nevertheless took a seat near R.H.; he came over to R.H. three times, demanding to know why R.H. would not see him as a friend and as a therapist. R.H. told Petersen she would not explain anymore; she just wanted Petersen to leave her alone. R.H. finally gathered her children and left the rodeo. Petersen left the rodeo and followed R.H. in his car, but R.H. lost him by driving faster than normal.

Later in 1991, Petersen confronted R.H. as she was leaving the Bear Paw Festival in Eagle River. Petersen (who was in his vehicle) pulled up next to R.H. as she was walking with her children. Petersen again demanded to know why R.H. refused to speak with him. This conversation ended when R.H. called to her husband for help. R.H.'s husband ran across the parking lot, kicked Petersen's car, then grabbed Petersen and told him to stay away from R.H. and their family.

Following this encounter, R.H. spoke again to Dr. Kanady about Petersen's behavior. On July 1, 1991, Kanady directed the clinic's attorney to send Petersen a letter "firing" him as a patient at the clinic.[1]

On the same day this letter was drafted, R.H. telephoned Petersen; Dr. Kanady, Kanady's wife, and Anchorage Police Officer Paul T. Morino were in the room, listening on the speakerphone. R.H. told Petersen that she wanted him to stay away from her and that she did not want to see him, either as a patient or as a friend. Petersen said

that he understood and that he would stay away.

However, Petersen continued to show up outside the Kanady Clinic and at other places where R.H. went. On a Saturday in the fall of 1991, R.H. spotted Petersen sitting in his car behind a gas station across the street from the Kanady Clinic. Petersen was watching R.H., and R.H. could see "some big camera lens or telescope of some sort" in Petersen's car. Later that fall, R.H. encountered Petersen as she was driving from her home toward the Old Glenn Highway. R.H. drove north on the Old Glenn to lose Petersen, then circled back to the police substation in Eagle River. Despite R.H.'s evasive efforts, Petersen was able to follow her; he eventually arrived at the substation, where R.H. pointed him out to the police as the man who was following her. The officer on duty at the substation later telephoned Petersen, telling him that R.H. was fearful of him and that he should stay away from her.

In the early morning hours of January 6, 1992, R.H. and her husband noticed the taillights of a vehicle in their driveway. When they turned on the outside floodlight, they saw a car that looked like Petersen's. The car left the driveway, and R.H. and her husband went back to bed. About twenty minutes later, R.H.'s husband heard a car coming up the driveway. Taking a gun, he went outside and sneaked up to the car. The driver of the car was Petersen. Petersen apparently heard the husband's approach; he looked over his shoulder, saw R.H.'s husband, and quickly drove out of the driveway. R.H.'s husband fired two shots into a snowbank as Petersen's car pulled away.

As a result of this incident, Petersen was convicted of trespass. On April 3, 1992, he received a suspended imposition of sentence;

---

1. This letter informed Petersen that the Kanady Clinic would "no longer ... render professional services of any type" to him. The letter listed the reasons for this action:

> As Dr. Kanady and [R.H.] have discussed with you personally, your obsessive behavior toward [R.H.] far exceeds the limits of acceptable conduct on the professional, let alone the personal level. [Even after you were notified that] such behavior cannot be condoned, still you have persisted in your harassment of [R.H.], not only at [the] Kanady Chiropractic Clinic but

also at [R.H.'s] home, at the Alaska Athletic Club, even at public places and in the presence of her family. Your behavior has caused a serious disruption of the functions of [the] Kanady Chiropractic Center and has rendered it impossible for the center to continue to provide you services.... In short, Mr. Petersen, stop harassing the Kanadys and their staff. We have filed police reports regarding your conduct. If that conduct should continue, we will have you arrested.

one of his conditions of probation was that he not go to R.H.'s residence.

Two months later, on June 5, 1992, R.H. and her children attended the Renaissance Fair in Anchorage. R.H. spotted Petersen in the distance. He began circling through the crowd, moving toward R.H. and her children until he was within touching distance. R.H. began screaming for Petersen to get away from her. With the crowd now staring, Petersen backed away. R.H. took her children and left. As she was leaving, she looked and saw Petersen watching her; she ran to her car.

On August 27, 1992, R.H. called the police after seeing Petersen's car pass back and forth in front of the Alaska Athletic Club, where she was working part-time. Throughout the fall and winter, R.H. often saw Petersen watching her at the Kanady Clinic and at the athletic club.

On January 6, 1993, R.H. encountered Petersen at an intersection near her home. Petersen attempted to ram R.H.'s car with his. R.H. sped home, with Petersen following her. R.H. got inside her house and called the police. When the police contacted Petersen, he denied being in the area. Then he told the officer that he and R.H. had had an affair, and he accused R.H. of making false accusations against him in order to cover up her other extramarital affairs.

The next day, R.H. saw Petersen pacing back and forth across the street from the Kanady Clinic; he was watching her. R.H. called her husband, who immediately drove to the clinic. By the time he arrived, Petersen was gone.

For his attempt to ram R.H.'s car, Petersen was convicted of assault. Sentenced on April 7, 1993, Petersen was placed on five years' probation and ordered to have no contact with R.H., "including not being within one block of her places of employment or residence."

On May 29, 1993, R.H. encountered Petersen as she entered the Carrs grocery in Eagle River. Petersen stood directly in front of R.H.; she told him to "just keep going", but he responded, "I was here first." R.H. raised her voice and again told Petersen to "just keep going". Petersen walked back toward the cash registers, and R.H. lost track of him. When she had finished shopping and was leaving the store, R.H. noticed that Petersen was in the store's coffee shop. As she got in her car, she looked back at Petersen, and he "flipped [her] off".

On June 21, 1993, R.H. had dinner with a friend at the Regal Alaskan Hotel. As the two women walked out of the hotel toward R.H.'s car, R.H. looked up and saw Petersen walking toward them. Petersen approached within "touching distance". R.H. said to him, "You are the biggest creep in the universe." In response, Petersen began to berate R.H., repeatedly calling her a "whore". R.H. became scared, fearful that Petersen intended to assault her again. R.H. and her friend got into R.H.'s car, then drove to the front of the hotel where the friend's car was parked. They observed Petersen standing outside the hotel entrance, watching them. Petersen ran across the street and into a park, where he hid in some bushes. Petersen then got into his car and followed the two women as they drove out of the parking lot in their respective cars. R.H. drove home and called the police.

On July 11, 1993, R.H. attended the Bear Paw Festival in Eagle River with her children. She again encountered Petersen. Petersen passed R.H. "within touching distance", but did not speak to her; he then walked away. R.H. called the police on her cellular phone and waited for them to respond. While she waited, Petersen came back through the crowd and passed in front of R.H. and her children, glaring at them. The police never responded to R.H.'s call, so she left the festival. Petersen watched her as she left.

One week later, on July 18, 1993, Anchorage Police Officer Lise Shore saw Petersen's car on the Old Glenn Highway, near R.H.'s home. Petersen slowed his car as if to turn onto R.H.'s street, then drove past and turned onto another street, Amnundson Road. Officer Shore then saw Petersen come back out of Amnundson Road, reenter the Old Glenn Highway, and turn onto R.H.'s street. Following Petersen, Shore turned onto R.H.'s street and then drove up R.H.'s

driveway. In the driveway, she encountered Petersen, who was coming out of the driveway. Petersen attempted to drive around Shore's patrol car, but Shore used her car to block Petersen's exit.

When Shore questioned Petersen as to why he was in that area, Petersen claimed he was looking for Amnundson Road. When Shore informed Petersen that she had seen him turn onto Amnundson earlier, then had observed him come back and turn onto R.H.'s street, Petersen claimed he had been looking for a place to turn around. When Officer Shore reminded Petersen that he was not supposed to be at R.H.'s house, Petersen said that he thought it would be all right to turn around in R.H.'s driveway because he hadn't seen any lights on in R.H.'s house.

While Shore was questioning Petersen, R.H. drove up and encountered Shore and Petersen at the end of her driveway. Officer Shore arrested Petersen and placed him in her patrol car; he began beating his head against the prisoner's screen. Petersen told Shore that he loved R.H. and that he had come to her house only because he wanted to "explain some things to her".

Petersen was charged with first-degree stalking, AS 11.41.260(a)(2). He was convicted following a jury trial in the Anchorage superior court.

*Facts of the Case: Larson*

Bruce Larson, Jr., was involved in a romantic relationship with I.H.; he lived in Unalaska with I.H. and her daughter. In May of 1994, Larson was convicted of assaulting I.H., and a restraining order was entered that prohibited Larson from having any contact with her. Larson was later convicted of violating the restraining order. However, despite these difficulties, I.H. and Larson resumed their relationship.

On December 1, 1994, Larson (who is a commercial fisherman) returned to Unalaska from over a month at sea. Almost immediately, the relationship between Larson and I.H. began to deteriorate. On December 3rd, Larson and I.H. went out to the UniSea Bar in Dutch Harbor. Larson made several remarks that prompted I.H. to leave without him. She handed Larson the keys to her car and told him that she would be leaving with friends. As I.H. walked across the parking lot, Larson ran up from behind her and "slammed" into her back. Larson then took hold of I.H.. She told him, "Please don't touch me; leave me alone." Larson screamed at I.H., calling her a "fucking bitch".

I.H. got into her friends' car and they started to drive to the other side of the island (from Dutch Harbor to Unalaska). Larson chased them, tailgating their car in a dangerous manner. Because of Larson's actions, I.H. asked her friends to take her to the Unalaska police station. Larson followed them most of the way, then made a u-turn and left. At the police station, I.H. explained that Larson had her keys and that she no longer wanted him to stay at her apartment. She asked the police to accompany her home and to assist her in removing Larson's belongings.

The police and I.H. went to her apartment and gained entry by borrowing a key from the landlord. Larson was not in I.H.'s apartment, but the officers found him in the upper floor of the apartment building. Larson relinquished his key to I.H.'s apartment and removed his personal possessions from the apartment. I.H. told Larson not to come back, and the police also instructed him to stay away. However, when the police checked the area a short time later, they found Larson hiding under a car. They again directed him to leave the area.

Later that night, Larson telephoned I.H. approximately fifteen times. During one of these calls, Larson informed I.H. that he was going to pick up I.H.'s daughter from the babysitter and take her. In response, I.H. telephoned the police and again asked for their assistance: an officer stood guard as I.H. went to the babysitter and picked up her child.

The next day (December 4th), Larson telephoned I.H. to tell her that she needn't go to work because he had "trashed" her office. (It turned out that this was not true.) On December 8th, Larson appeared at I.H.'s door at 1:00 a.m. and asked her to talk with him; when I.H. declined, Larson sat in a

truck outside I.H.'s apartment building until the police came and asked him to leave.

On December 10th, Larson repeatedly called I.H. at work. Later that day, he confronted her at the UniSea Bar (where she was seated with a group of friends). Using vulgar language, Larson accused several of the men in the group of having had sex with I.H.. When I.H. asked Larson to leave, he told her, "Don't bother driving the car tonight; it won't start." He also told her, "I'm going to ruin your night. I'm going to screw up your life. You're a bitch."

I.H. took a cab back to her apartment. As she was putting her key in the lock, she became aware that Larson was behind her. Larson said, "You fucking bitch, I'm going to kill you. You're the next Nicole Simpson." Although I.H. was scared, she shoved Larson away; then she finished unlocking the door and went inside. Once inside her apartment, she had a friend call the police. When the police arrived, they found Larson at a nearby phone booth; they arrested him.

Larson was indicted for first-degree stalking under two theories: first, that he had previously been convicted of violating a domestic violence restraining order, AS 11.41.260(a)(5), and second, that he had previously been convicted of assaulting I.H., AS 11.41.260(a)(6)(A). Under a subsequent plea agreement, Larson pleaded no contest to a reduced charge of second-degree stalking, reserving his right to attack the constitutionality of the statute. *Cooksey v. State,* 524 P.2d 1251, 1255–57 (Alaska 1974).

### Facts of the Case: Colbry

Donald Colbry was married to E.H. for several years; their family included two children from Colbry's former marriage, as well as a daughter of their marriage. After the birth of their daughter, Colbry began drinking and manifested a tendency toward violence. In May 1993, E.H. asked Colbry to agree to a dissolution. Colbry initially agreed, but he delayed leaving the house. He finally moved out in August 1993.

During September 1993, Colbry telephoned E.H. three or four times a day, both at home and at work. He threatened to fight for custody of their daughter and to "take [E.H.] for everything [she] had". Colbry also threatened J.L., a man whom he suspected of being romantically involved with E.H.. Toward the end of September, Colbry assaulted E.H.; she called the troopers, who took Colbry away, but no criminal charges were filed against Colbry at that time.

Two weeks later, on October 10, 1993, Colbry again assaulted E.H.; he slapped her and pushed her through a screen door. This time, E.H. decided to seek judicial intervention. Accompanied by J.L., she went to the courthouse and obtained a domestic violence restraining order against Colbry. The magistrate who issued the order telephoned Colbry from court and informed him that he was now forbidden from contacting E.H..

E.H. and J.L. left the courthouse in separate cars. Colbry drove past in the opposite direction; seeing their cars, Colbry turned around and began to pursue J.L. at high speed. J.L. drove to the State Trooper headquarters on Tudor Road. As J.L. was telling the troopers about Colbry's actions, Colbry drove up and told the troopers that J.L. had tried to run him off the road. Then, in the trooper's presence, Colbry informed J.L. that he was going to kill him.

When Colbry drove away from this encounter, he went to E.H.'s home. Ignoring the no-contact provision of the domestic violence restraining order (which had been issued only hours before), Colbry barged into E.H.'s house and began to scream at E.H.. He told her that the next time he encountered J.L., J.L. wouldn't be able to ask the troopers for assistance because Colbry would "kill him before he got there". When E.H. tried to reach the telephone, Colbry grabbed her by the neck and pulled her away. The police were summoned by the couple's daughter, who had run to a neighbor's house to make the call. By the time the police arrived, Colbry was gone.

In the ensuing weeks, Colbry frequently appeared at E.H.'s workplace and followed E.H. home from work. In December 1993, Colbry used his key to enter E.H.'s residence without permission. When he began to yell at E.H., she called the police. The police dispatcher spoke with Colbry and convinced

him to leave, but after Colbry finished speaking with the dispatcher, he grabbed E.H. and threw her against the wall before he left.

In January 1994, Colbry was convicted of fourth-degree assault for the episode of October 10, 1993 (Colbry's visit to E.H.'s house on the day the court issued the domestic violence restraining order). Colbry received a suspended imposition of sentence. As a condition of probation, he was again ordered to have no contact with E.H..

In March 1994, Colbry was convicted of trespass based on the December episode in which Colbry entered E.H.'s house without permission and threw her against the wall. Again, as a condition of probation, Colbry was ordered to have no contact with E.H.. In addition, E.H. obtained another domestic violence restraining order against Colbry.

Despite these court orders, Colbry continued to telephone E.H.'s home, and he repeatedly threatened to harm or kill J.L. (with whom E.H. was now living).[2] On February 26, 1994, Colbry telephoned E.H. and told her that she should not plan on marrying J.L. because, if E.H. intended to do that, Colbry would kill him first. In early March, Colbry saw E.H. and J.L. together in a restaurant. A few days later, Colbry called E.H. and told her that if he ever saw E.H. sitting together with J.L. again, Colbry would "jerk [J.L.] off the chair and kill him".

On June 7, 1994, after E.H. informed the police that Colbry had again violated the restraining order, the police prepared to monitor and record Colbry's next telephone call. Colbry called E.H.'s house later that day; J.L. answered the phone. During ensuing the conversation, Colbry made numerous threats to injure or kill J.L..

In August 1994, Colbry was indicted for first-degree stalking under six separate theories. Colbry ultimately pleaded no contest to a single consolidated count that charged him with first-degree stalking under both AS 11.41.260(a)(1) and 260(a)(2) (because his acts of stalking were violations of both the domestic violence restraining order and his condi-

---

2. Because E.H. was living with this man, he was a "family member" as defined in AS

tion of probation), as well as 260(a)(6)(A) (because he had previously been convicted of assaulting E.H.). Colbry reserved the right to challenge the constitutionality of the statute. *Cooksey, supra.*

*The Definition of "Stalking" and a General Discussion of the Defendants' Constitutional Claims*

The basic definition of "stalking" is codified in AS 11.41.270, the second-degree stalking statute. Subsection (a) of this statute declares that the crime of stalking is committed when a person

knowingly engages in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member.

Subsections (b)(1) and (b)(3) of the statute provide a limiting definition of the phrase, "course of conduct":

In this section, "course of conduct" means repeated acts of nonconsensual contact involving the victim or a family member[.] ... "[N]onconsensual contact" means any contact with another person that is initiated or continued without that person's consent, [or] that is beyond the scope of the consent provided by that person, or that is in disregard of that person's expressed desire that the contact be avoided or discontinued; "nonconsensual contact" includes

(A) following or appearing within the sight of that person;

(B) approaching or confronting that person in a public place or on private property;

(C) appearing at the workplace or residence of that person;

(D) entering onto or remaining on property owned, leased, or occupied by that person;

(E) contacting that person by telephone;

(F) sending mail or electronic communications to that person; [or]

11.41.270(b)(2).

(G) placing an object on, or delivering an object to, property owned, leased or occupied by that person[.]

This is the basic definition of the crime. This conduct, by itself, constitutes second-degree stalking. The offense becomes first-degree stalking under AS 11.41.260(a) if the actions constituting the stalking were in violation of a domestic violence restraining order, *see* 260(a)(1), or were in violation of a condition of probation, parole, or bail, *see* 260(a)(2); or if the victim was under age 16, *see* 260(a)(3); or if the defendant possessed a deadly weapon during the stalking, *see* 260(a)(4); or if the defendant had previously been convicted of either stalking or violating a domestic violence restraining order, *see* 260(a)(5); or if the defendant had previously been convicted of one or more of the assaultive crimes listed in 260(a)(6) involving the same victim.

In the present appeals, the defendants assert that the statutory definition of stalking is unconstitutionally "vague". However, their primary argument is that the statute criminalizes "innocent behavior protected by [the] rights of association and the freedom a citizen [possesses] to go about his daily behavior". [Peterson's opening brief, p. 18] Properly understood, this is a substantive due process claim or an overbreadth claim rather than a vagueness claim.

■ A statute is unconstitutionally vague if its wording is so imprecise "that people of common intelligence would be relegated to differing guesses about its meaning". *Schad v. Arizona*, 501 U.S. 624, 632, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991). Such a statute offends constitutional values in two major ways: by failing to give people "adequate notice of the conduct that is prohibited", and by placing a power of arbitrary or discriminatory enforcement in the hands of police, prosecutors, and ultimately judges and juries. *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979).[3]

The defendants do level a cursory vagueness attack on a few of the terms used in the definition of stalking. The defendants assert in conclusory fashion, without providing any supporting argument or citation to legal authority, that the terms "follow" and "approach", as well as the phrase "appear within the sight of", are all too vague to be understood by people of common intelligence.

■ The stalking statutes require the State to prove that the defendant acted knowingly. We believe that people of common intelligence would readily understand the meaning of "knowingly follow another person", "knowingly approach another person", and "knowingly appear within the sight of another person". *See State v. Culmo*, 43 Conn.Supp. 46, 642 A.2d 90, 98–99 (1993), *People v. Bailey*, 167 Ill.2d 210, 212 Ill.Dec. 608, 617–18, 657 N.E.2d 953, 962–63 (1995), and *State v. Bryan*, 259 Kan. 143, 910 P.2d 212, 217–21 (1996) (all holding that the term "follow" is not vague). Given the apparent clarity of these terms, the defendants' conclusory assertions of vagueness are not sufficient to preserve their claims. *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 410 (Alaska 1990) ("where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

■ The defendants also claim that the word "repeated" is too vague to be understood. However, this court has interpreted "repeated" to mean "more than once", and has held that this term is not vague. *Konrad v. State*, 763 P.2d 1369, 1379 (Alaska App.1988). The defendants do not even cite *Konrad*, much less give any reason for believing that it was wrongly decided.

This brings us to the defendants' primary argument. As indicated above, the defendants' main argument is not that the statutory definition of stalking is incapable of being understood. Rather, they argue that the definition of the crime manifestly includes too much. The defendants contend that the definition of stalking includes innocent conduct—blameless personal activities that can not properly be criminalized by the legislature. Essentially, the defendants are making a substantive due process claim: they

---

**3.** In addition, some unlawfully vague statutes may chill the right of free speech. *Id.*

assert that the legislature has exceeded its proper law-making authority.[4]

■ Alternatively, one could characterize the defendants' argument as a claim that the statutory definition of stalking is "overbroad" because it punishes conduct that people have a constitutional right to engage in. Although courts often discuss overbreadth as an aspect of vagueness, these two concepts are distinct. "[A] statute may be invalid for being overbroad [even though its wording is] clear and precise if it prohibits constitutionally protected conduct." *Stock v. State*, 526 P.2d 3, 7 n. 7 (Alaska 1974) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972)).

This recasting of the defendants' argument does not alter the importance of the concerns the defendants raise. If anything, it heightens those concerns: for between two laws, the first one worded so ambiguously that it might proscribe innocent behavior and the second one worded precisely to achieve this unlawful aim, society might justifiably condemn the second law more strongly. We thus turn to the merits of the defendants' challenges to the definition of stalking.

The definition of "nonconsensual contact" contained in AS 11.41.270(b)(3) is quite broad. "Nonconsensual contact" includes such acts as approaching another person, appearing within sight of another person, initiating a conversation, calling someone on the telephone, or sending a letter to someone if these acts are done "without that person's consent". The wording of 270(b)(3) suggests that the phrase "without that person's consent" is not limited to instances in which the other person has previously expressed a desire not to be contacted. Rather, it appears that this phrase covers all contacts that are not expressly authorized beforehand.[5] De-

fined in this fashion, "nonconsensual contact" could include such everyday activities as making telephone solicitations for businesses or charities, sending advertising brochures in the mail, or walking up to someone to ask them to sign a political petition or contribute to a social cause. These activities could all be "nonconsensual contact" if the recipient of these attentions was not in an agreeable mood.

The other side of the coin is that, even when the recipient of these contacts has previously expressed a desire not to be contacted, there may be situations in which a defendant's right to continue the contact is constitutionally guaranteed. For instance, the definition of "nonconsensual contact" is broad enough to include a defendant who repeatedly pickets a government office building or who makes repeated telephone calls to a government office to protest an official's actions.

■ Nevertheless, the crime of stalking requires proof of more than repeated acts of nonconsensual contact. Under AS 11.41.270(a), the State must prove (1) that the defendant "knowingly" engaged in repeated acts of nonconsensual contact, (2) that the defendant's conduct placed another person in fear of injury or death (or in fear of the injury or death of a "family member" as defined in AS 11.41.270(b)(2)), and (3) that the defendant acted "recklessly" with regard to this result. The question, then, is whether these three additional elements are sufficient to make the definition of stalking constitutional.

*Public Encounters*

Defendants Petersen and Larson point out that, under AS 11.41.270(b)(3), stalking includes the acts of "approaching ... [another]

---

4. A statute violates substantive due process when "it has no reasonable relationship to a legitimate government purpose". *Griswold v. Homer*, 925 P.2d 1015, 1019 (Alaska 1996)(citing *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974)).

5. AS 11.41.270(b)(3) declares that a "nonconsensual contact" is any contact that is "initiated or continued without [the other] person's consent" *or* any contact that is "beyond the scope of the

consent provided by that person" *or* any contact that is "in disregard of that person's expressed desire that the contact be avoided or discontinued". Because this third clause covers instances in which the targeted person has previously expressed a desire to have no further contact, the first clause assumedly addresses unconsented-to contact that occurs even when the other person has not previously expressed a desire to be left alone.

person in a public place" and even "appearing within the sight of that person" in a public place. The defendants suggest that these provisions of the statute are so broad as to effectively forbid people from attending public events, taking public transportation, going to restaurants, engaging in normal shopping, or even walking down the street for business or pleasure—because if the person were by chance to encounter or appear within sight of the alleged stalking victim, the State could charge them with recklessly disregarding the possibility that the other person would be there too.

■ However, as explained above, the crime of stalking requires proof that the defendant knowingly engaged in repeated acts of nonconsensual contact. Under AS 11.81.900(a)(2), to prove that a person "knowingly" engaged in conduct, the government must establish that the person "[was] aware that [his or her] conduct [was] of that nature". This provides one answer to the defendants' contention that a person might be prosecuted for happening to attend the same public function as the victim or happening to patronize a restaurant or grocery at the same time as the victim. A defendant who inadvertently encounters another person in a public place has not "knowingly" approached or appeared within sight of that person.

■ This, however, is only a partial answer to the defendants' argument. There may be times when the defendant knows beforehand that the other person will be attending a public function (say, a music festival or a municipal assembly meeting) that the defendant also has a legitimate interest in attending. If the defendant attends the festival or assembly meeting and the other person is there as expected, the defendant will have "knowingly" come within the sight of the other person.[6]

Additionally, the defendants suggest the hypothetical situation of a person who, in the course of promoting a political or social cause, knowingly initiates contact with other people without their consent, either by approaching them on the street, or by telephoning them, or by coming to their home or workplace. For example, a person seeking signatures for a political petition might come door-to-door or might approach people at public gatherings. If the defendant's cause was unpopular, the defendant might reasonably anticipate that most people would not welcome his or her approach.

These objections lose their force when a defendant is charged with first-degree stalking under either AS 11.41.260(a)(1) or 260(a)(2)—the provisions that speak to acts of stalking committed while the defendant is under a court order or a parole condition that prohibits the defendant from having contact with the other person in the first place. The defendants in the present appeals do not challenge the constitutionality of domestic violence restraining orders or the constitutionality of no-contact orders imposed as a condition of bail, probation, or parole.[7] Nor have the defendants suggested any reason to believe that the constitution forbids the legislature from enacting a criminal statute that addresses a defendant's repeated knowing violations of a no-contact order.

Of the three present appeals, two involve defendants who were convicted of first-degree stalking under AS 11.41.260(a)(1) or (a)(2). Both Petersen and Colbry were under court orders not to have contact with their victims. The facts of Colbry's case do not raise the issue of knowing encounters in public places; Colbry was charged with stalking for committing physical assaults on his victim and for making a series of threat-

---

6. We note, however, that AS 11.41.270(b)(4) defines "victim" as "a person who is the target of a course of conduct". Although we need not decide this point in the present appeals, the legislature's use of the word "target" suggests that the defendant's conduct must be consciously directed toward the other person.

7. See, for example, *State v. Gilkey*, 111 Or.App. 303, 826 P.2d 69 (1992), where the Oregon Court of Appeals upheld a condition of probation that

required the defendant to obtain written permission from a probation officer or the court before contacting his wife for any reason. The defendant asserted that this condition of probation "constitute[d] an excessive infringement on his fundamental right to associate with his marriage partner", but the court held that the defendant's record of assaulting and harassing his wife "amply justified" the condition of probation. *Id.*, 826 P.2d at 71.

ening telephone calls to her. However, some of the acts charged against Petersen consisted of approaching R.H. in public places. Because of this, the existence of no-contact orders is significant in Petersen's case.

One of Petersen's conditions of probation from his April 1992 trespass conviction prohibited him from going to R.H.'s residence. This prohibition was broadened when, in April 1993, Petersen was convicted of assault for attempting to ram R.H.'s car. In Petersen's conditions of probation from the 1993 assault case, he was ordered to have no contact at all with R.H., "including not being within one block of her places of employment or residence". Despite this no-contact order, Petersen confronted R.H. as she entered a grocery store in May 1993, he confronted and yelled at R.H. at the Regal Alaskan Hotel in June 1993, he approached "within touching distance" of R.H. at the Bear Paw Festival in July 1993, and he was finally arrested one week later after a police officer found him in R.H.'s driveway. Peterson was convicted of violating AS 11.41.260(a)(2): stalking when the acts constituting the offense were also violations of a condition of probation.

Because Peterson was under court order to have no contact with his victim, and because he does not challenge the lawfulness of this condition of probation, we conclude that Petersen had no constitutional right to knowingly approach or follow R.H., even in public places or at public events. Even if these portions of the definition of stalking might be unconstitutionally broad when applied generally, Petersen was under a no-contact order, and the State's proof of this additional element in Petersen's case means that he has no claim.

Colbry, like Petersen, was under a court order not to contact his victim. Moreover, even if the stalking statutes posed constitutional problems with respect to public encounters, these problems would not affect Colbry's case. The acts of nonconsensual contact charged against Colbry were not public encounters, but rather physical assaults and threatening telephone calls.

■ Defendant Larson's case is distinguishable from Petersen's and Colbry's because Larson was convicted of second-degree stalking; the State did not assert that Larson's conduct violated any court order or parole condition. Thus, in Larson's case we must address the contention that the definition of stalking is unconstitutional because it allows a person to be prosecuted for encountering someone else in a public place when that other person does not wish to have contact with him.

■ Here, we confront again the hypothetical situation of a political protester who knowingly engages in repeated nonconsensual contacts with a government official to protest the government's actions or policies—for example, by picketing the building where the official works, or by making repeated telephone calls to her office, or by sending her vituperative letters of protest. However, as already noted, these actions do not constitute the crime of stalking unless the State proves that the defendant recklessly placed another person in fear of injury or death. That is, the State must establish that the defendant's actions actually caused another person to fear injury or death, that the defendant consciously disregarded a substantial and unjustifiable risk that his actions would have this effect, and that the defendant's disregard of this risk constituted a gross deviation from the standard of care that a reasonable person would exercise in that situation. *See* AS 11.81.900(a)(3).

■ The government clearly possesses the authority to prosecute a person for recklessly causing another to fear imminent injury or death. This is the essence of the third- and fourth-degree assault statutes, AS 11.41.220(a) and 11.41.230(a). The First Amendment does not protect the utterance of threats, even when the defendant's threats are motivated by, or comprise part of, a political protest. For instance, 18 U.S.C. § 871 makes it a felony to threaten to harm or take the life of the President of the United States. Because this statute is squarely aimed at speech, the United States Supreme Court has declared that the statute must be interpreted so as to preserve the First Amendment values of open and robust political debate. *Watts v. United States,* 394 U.S. 705, 707–08, 89 S.Ct. 1399, 1401–02, 22

L.Ed.2d 664, 667 (1969). Thus, the statute does not prohibit political hyperbole that would not cause a reasonable person to perceive an actual threat to the President. *Watts,* 394 U.S. at 707–08, 89 S.Ct. at 1401–02. However, it is no defense that a threat to the President is accompanied by religious or political statements. *See, e.g., United States v. Callahan,* 702 F.2d 964, 966 (11th Cir.1983), *cert. denied* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983).

Thus, the requirement that the defendant recklessly place another person in fear of injury or death substantially answers the defendants' challenge to the portions of the stalking statutes dealing with encounters in public places. Still, it is unclear whether this is a total answer to the defendants' First Amendment arguments. It is possible to imagine troublesome cases brought under the stalking statute. For instance, protesters might repeatedly picket an abortion clinic or the office of the Ku Klux Klan, committing acts of "nonconsensual contact" against the people who work there. (Under AS 11.41.270(b)(3), nonconsensual contact is defined as "any contact with another person that is initiated or continued without that person's consent, ... includ[ing] ... appearing at the workplace of that person".) Depending upon the emotion and the rhetoric of the protesters, the people working inside might fear injury or death because of the protesters' actions, and there might be close questions as to (1) whether that fear was reasonable, and (2) whether, even if the fear was reasonable, the protesters' actions should still be protected by the First Amendment.

Besides these overbreadth issues (situations where the stalking statutes may infringe constitutional rights), the stalking statutes also present substantive due process issues. Leaving aside the realm of constitutionally protected activities, there are still limits to a legislature's power to regulate or criminalize conduct. *See, e.g., Richards v.*

*Thurston,* 424 F.2d 1281, 1284–85 (1st Cir. 1970) (declaring that the guarantee of liberty is "incomplete" if "the state [is] free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty"). The stalking statutes pose due process problems because they potentially apply to situations where defendants engage in no activity other than going about their daily lives.

For instance, a group of skinheads may routinely ride the municipal bus. Their appearance, their language, and their demeanor may cause other regular bus riders to fear for their safety. The skinheads know that the other bus riders are afraid of them, but they continue to ride the bus. Have the skinheads committed stalking?

Or, to take another example, a person paroled from prison after serving a sentence for sexual abuse of children may be employed at the check-out counter of a grocery. Parents who patronize the grocery become aware of the parolee's background. Although the parents would prefer not to come into contact with the parolee, they inevitably do. Moreover, because of the parolee's background, these parents are afraid for the safety of their children who sometimes stop at the grocery after school to buy snacks. The parolee learns that the parents are afraid, but he continues to work at his job. Has the parolee committed stalking?

In both of these hypothetical situations, the government could plausibly claim that the defendant, through repeated acts of nonconsensual contact as defined in AS 11.41.270(b)(3), has placed another person in fear of injury or death (either for themselves or for a family member). Further, the government could plausibly claim that the defendant consciously disregarded a substantial and unjustifiable risk that his conduct would have this result. Yet the defendant's conduct was not directed at anyone; that conduct consisted of nothing more than riding the bus or pursuing a livelihood.[8]

---

**8.** We note that the definitions of third- and fourth-degree assault potentially raise this same problem. Under AS 11.41.220(a)(1)(A) and AS 11.41.230(a)(3), a defendant commits assault if the defendant recklessly places another person in fear of serious physical injury (third-degree assault) or imminent injury (fourth-degree assault). Similar to the hypotheticals discussed in the preceding two paragraphs, one can imagine situations in which a defendant recklessly places an-

■ Thus, the definition of stalking may present troubling cases. However, when a constitutional challenge is leveled against a statute whose main concern is conduct rather than speech, "the possibility of difficult or borderline cases will not invalidate a statute" if there is a "hard core of cases to which ... the statute unquestionably applies". *Stock v. State*, 526 P.2d 3, 9 (Alaska 1974). *See Broadrick v. Oklahoma*, 413 U.S. 601, 615–16, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 842 (1973) (Before a statute will be invalidated for overbreadth "where conduct and not merely speech is involved, ... the overbreadth of [the] statute must [be] substantial[,] ... judged in relation to the statute's ... legitimate sweep. [If not], whatever overbreadth may exist should be cured through case-by-case analysis[.]")

For instance, in *Holton v. State*, 602 P.2d 1228 (Alaska 1979), the supreme court upheld the definition of the offense of contributing to the delinquency of a minor against the defendant's claim that the phrase "immoral conduct" was too vague to be understood by persons of common intelligence. The court ruled that, regardless of the potential vagueness of this phrase, inducing a minor to engage in fellatio came within the "hard core" of that term. 602 P.2d at 1236–37. And in *Peratrovich v. State*, 903 P.2d 1071 (Alaska App.1995), this court upheld the definition of "sexual contact" against the contention that the phrase "normal caretaker responsibilities" might be construed too narrowly, thus criminalizing some innocent touchings. We held that, regardless of any potential ambiguity, the defendant's act of touching the victim's breast against her will was part of the core conduct prohibited by the statute. 903 P.2d at 1078.

The facts of Larson's case do not raise the constitutional concerns argued in the defendants' briefs. Larson was charged with physically assaulting I.H., threatening to kill her, threatening to kidnap her child, and chasing and tailgating I.H.'s vehicle. In his motion to dismiss, Larson did not deny any of this conduct, nor did he claim that he had

other person in fear of imminent injury by his conduct, even though the defendant's conduct was not directed at that other person. However,

a constitutional right to engage in any of this conduct.

It is true that one of the incidents between Larson and I.H. occurred in a bar, but on this occasion Larson did not simply come within sight of I.H. while patronizing the bar. Rather, Larson walked over to I.H.'s table, verbally abused her and her companions using vulgar language, then threatened to disable I.H.'s vehicle and "screw up [her] life". The bar's bouncer intervened, removing Larson before a fight could start. Larson thereupon went to I.H.'s residence and waited for her to come home; as I.H. was entering her door, Larson approached her and threatened to kill her. Even supposing that the First Amendment gave Larson the right to approach I.H. in a public place and insult her, he had no right to come to her residence and threaten to kill her.

■ More generally, none of the cases presently before the court are "borderline" cases. The acts of stalking involved in these cases—knowingly contacting another person in violation of a court order, threatening to harm or kill the other person or their current romantic partner, threatening to kidnap a person's child, and physically assaulting another person—are at the core of the definition of stalking. The defendants do not claim that they had any constitutional right to engage in these activities. Assuming for purposes of argument that the definition of stalking potentially presents serious constitutional issues at its periphery, the acts charged against these defendants can not reasonably be characterized as constitutionally protected activities.

Accordingly, we are convinced that the potential due process and overbreadth problems in the definition of stalking do not require invalidation of the stalking statutes. Rather, those problems should be resolved on a case-by-case basis, if and when we face litigation that actually presents those problems. We hold that, as applied to these three defendants, the portions of the stalking statutes dealing with public encounters are constitutional.

we are aware of no litigation in which the assault statutes have been stretched to this extent.

### Telephone Contacts

 The defendants raise a separate constitutional challenge to AS 11.41.270(b)(3)(E), the portion of the statute specifying that "contacting [another] person by telephone" is part of the definition of "nonconsensual contact". Two of the present appeals involve acts of telephonic contact between the defendants and their victims. In Defendant Colbry's case, the charged conduct consisted almost entirely of threatening telephone calls.[9] Relying on *McKillop v. State*, 857 P.2d 358 (Alaska App.1993), the defendants argue that a person can not be prosecuted for making telephone calls unless the State proves that the person's sole intention was to annoy or harass the recipient of the call.

*McKillop* dealt with the provision of AS 11.61.120(a)(4) that makes it a crime to "make[ ] an anonymous ... telephone call" with the intent "to harass or annoy another person". In *McKillop*, we concluded that this statutory provision would violate the First Amendment unless the statute were construed to require proof that the defendant's sole intent in making the call was to harass or annoy. 857 P.2d at 364–65. We reached this conclusion because the First Amendment protects social advocacy even when the speaker chooses to remain anonymous, *id.* at 362, and even when the speaker realizes (or intends) that listeners will perceive his speech as harassing or annoying. *Id.* at 364.

Although we concluded in *McKillop* that the portion of the harassment statute outlawing anonymous telephone calls had to be construed narrowly to remain consistent with First Amendment protections, the stalking statute differs significantly from the harassment statute. Telephone contact with another person constitutes "stalking" under AS 11.41.270 only when the telephone contact is part of a series of knowing acts of nonconsensual contact with the victim or a family member, and only when the defendant,

through this course of conduct, recklessly places another person in fear of injury or death (or in fear that a family member will suffer injury or death).

Placing another person in fear of injury or death by making a telephone call or a series of telephone calls can be likened to assault (but without the element of imminency). Compare AS 11.41.230(a)(3), which forbids a person from recklessly placing another person in fear of imminent injury "by words or other conduct". The defendants in the present appeals do not argue that they are constitutionally entitled to threaten other people over the telephone.[10] However, they assert that a person could be prosecuted under the stalking statutes for making telephone calls that place another person in fear even when the other person's fear is completely unreasonable.

The defendants point out that, under AS 11.81.900(a)(3), a person acts "recklessly" with respect to a result (here, that another person will be placed in fear of injury or death) if that person "is aware of and consciously disregards a substantial and unjustifiable risk" that the result will occur. The defendants argue that a person might need to call an estranged spouse or lover for perfectly legitimate, non-threatening reasons, yet at the same time realize that the recipient of the calls is paranoid and will likely feel threatened (albeit unreasonably) by the calls. The defendants contend that, if this hypothetical person makes the telephone calls, he or she can be prosecuted for stalking since he or she will have "consciously disregard[ed]" the risk that the telephone calls would make the other person fearful.

 The answer to the defendants' contention is that the definition of "recklessly" not only requires proof that the defendant consciously disregarded the risk that his or her conduct would cause the prohibited result, but also requires proof that this risk

---

9. As noted above, Colbry was under two separate no-contact orders (a domestic violence restraining order and a condition of probation) that prohibited him from contacting E.H.. Colbry was, however, permitted to telephone E.H.'s house once each evening, between 5:00 and 8:00, to speak with his daughter.

10. In *McKillop*, we were not called upon to interpret the clause of the harassment statute that forbids a person from making threatening telephone calls.

was "unjustifiable", and that the risk was "of such a nature and degree that disregard of it constitute[d] a gross deviation from the standard of care that a reasonable person would observe in the situation". Based on these two clauses of AS 11.81.900(a)(3), this court held in *Wyatt v. State*, 778 P.2d 1169, 1170 (Alaska App.1989), and reaffirmed in *DeHart v. State*, 781 P.2d 989, 990 (Alaska App.1989), that proof that a defendant "recklessly" placed another person in fear of injury implicitly requires proof that the victim's fear was reasonable.

 When the legislature enacted the stalking statutes, the legislature also adopted a letter of intent specifying that the phrase "recklessly places another person in fear" used in AS 11.41.260(a) was to be construed in conformity with *DeHart*. *See* 1993 Senate Journal 1026–27. We therefore conclude that the stalking statutes do not prohibit telephone calls or other nonconsensual contacts made for legitimate purposes, even when the defendant knows that the person contacted may (or will) unreasonably perceive the contact as threatening.[11]

*Constitutionality of the Stalking Statutes: Summary*

The constitutional arguments raised by the defendants are not trivial. As we noted at the beginning of this section, the stalking statutes' definition of "nonconsensual contact" covers a wide spectrum of social interaction. This definition is undoubtedly the Alaska Legislature's most comprehensive codification of a person's right to be free from unwanted contact. Yet even though our society values and protects individual autonomy and privacy, our society at the same time recognizes a person's right to engage in uncomfortable, distasteful, and annoying contacts—even abrasive confrontations—with other citizens. Such interactions are not merely tolerated; they are explicitly protected by our Constitution.

 However, the Constitution does not guarantee a right to threaten other people. When a person's words or actions constitute an assault—when they cause other people to reasonably fear for their own safety or the safety of those close to them—the Constitution no longer provides a refuge. We conclude that Alaska's stalking statutes are constitutional because, in essence, they outlaw assaultive conduct. To establish the crime of stalking, the government must prove that the defendant knowingly engaged in repeated acts of nonconsensual contact, the government must prove that these nonconsensual contacts placed another person in fear of injury or death, and the government must prove that the defendant acted with reckless disregard for this result. Because these elements must be proved, the Alaska stalking statutes do not, on their face, prohibit constitutionally protected speech or conduct.

As we indicated above, the stalking statutes may present difficult constitutional questions in particular hypothetical situations. However, the conduct of the defendants in these three appeals falls within the core of the statutory definition—assaultive conduct with no constitutional justification. We therefore reject the defendants' challenges to the statute.

Defendants Larson and Colbry present no issues on appeal except the constitutionality of the definition of stalking. We therefore affirm their convictions. Defendant Petersen

**11.** The State asks us to reconsider *Wyatt* and *DeHart*. According to the State, if we require the victim's fear to be reasonable, a malevolent person who knows of another person's paranoia or other unusual susceptibility to fear can torment that other person with impunity. The State suggests that "stalking defendants are familiar with and likely to take advantage of unreasonable and peculiar fears of their victims".

The present appeals do not require us to re-examine *Wyatt* and *DeHart*. We note, however, that under AS 11.81.610(c), when a crime requires proof that a defendant acted "recklessly" with respect to a specified result, the crime can also be established by proof that the defendant acted "intentionally" with respect to that result. It is arguable that the State could prosecute a defendant for intentionally placing a non-consenting victim in fear, even when that fear was unreasonable. *But see McKillop*, 857 P.2d at 364 (construing AS 11.61.120(a)(4) to require proof that annoyance or harassment was the defendant's sole intent). It is also conceivable that the legislature could address the State's concerns by enacting a statute tailored to this situation.

raises other issues, which we address in the next section of this opinion.

### Other Issues Raised by Petersen

At Petersen's trial, the State introduced evidence detailing Petersen's and R.H.'s interactions from the time Petersen began receiving massage therapy from R.H. in 1989. Petersen argues that the State should not have been permitted to introduce evidence of any events that occurred before May 28, 1993, the effective date of the stalking statutes. *See* ch. 40, § 9 SLA 1993. He contends that these pre-May 1993 contacts were "other bad acts" that should have been excluded under Evidence Rules 403 and 404(b).

We disagree. The State was obliged to prove that Petersen knowingly engaged in nonconsensual contact with R.H.. Obviously, R.H.'s reaction to Petersen's pre-May 1993 contacts (in particular, her explicit directions to Petersen that he stay away from her) were relevant to prove that Petersen was aware that R.H. did not consent to his post-May 1993 contacts with her.

Additionally, the State was obliged to prove that R.H. was placed in fear of injury or death by Petersen's post-May 1993 contacts. Clearly, evidence of Petersen's long-standing course of conduct toward R.H.—his persistent refusal to stay away from her, his repeated presence at her workplace, his middle-of-the-night trespass at her home in January 1992, and his attempt to ram R.H.'s car in January 1993—was relevant to establish that R.H. feared injury or death at Petersen's hands.

Finally, the State was obliged to prove that Petersen recklessly disregarded a substantial and unjustifiable risk that his conduct would cause R.H. to fear injury or death. Again, Petersen's pre-May 1993 conduct was relevant to prove this element of the offense.

Petersen argues that these uses of the evidence do not fit neatly into any of the categories listed in Alaska Evidence Rule 404(b)(1) ("motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"). We find the challenged evidence relevant to plan and knowl-edge. However, even if Petersen were right, this would not bar admission of the evidence. The legislature has declared that Rule 404(b)'s list of proper purposes for other crimes evidence is not intended to be exclusive. *See* ch. 79, § 1(c) SLA 1991 ("The amendment of [Evidence] Rule 404(b)(1) ... made by sec. 4 of this Act[ ] changes the [rule] to make it one of inclusion and to establish that the nonpropensity purposes listed in the rule are not inclusive and that evidence can be admitted if it is relevant to a purpose not listed in the rule.") Even before the legislature amended the rule, the Alaska Supreme Court upheld the admission of evidence of a defendant's other crimes when this evidence was needed to explain the defendant's relationship with another person. *Braham v. State*, 571 P.2d 631, 641 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978).

We therefore conclude that evidence of the pre-May 1993 contacts between Petersen and R.H. was admissible for non-propensity purposes. We also agree with the trial judge that the evidence was more probative than prejudicial. Petersen argued that most of his contacts with R.H. had been consensual and that R.H. was a manipulative person who was simply annoyed with Petersen, not fearful of him. In this context, evidence of the pre-May 1993 contacts was highly probative.

Petersen next argues that he could not be convicted of first-degree stalking under AS 11.41.260(a)(2) because the condition of probation that barred him from contacting R.H. was entered on April 7, 1993—before the effective date of the stalking statutes (May 28, 1993). Petersen contends that, even if he committed second-degree (misdemeanor) stalking, it would be an unlawful retroactive application of the first-degree stalking statute if the State were permitted to rely on the condition of probation from his April 1993 assault conviction to enhance his offense to first-degree (felony) stalking.

The Alaska Supreme Court addressed a similar contention in *Danks v. State*, 619 P.2d 720 (Alaska 1980). The issue in *Danks* was whether a statute that enacted increased penalties for repeat drunk driving offenders

could lawfully apply to a defendant who committed drunk driving after the new law came into effect but whose prior offenses were committed before the passage of the new law. The defendant in *Danks* argued that sentencing him to the increased penalties of the new law would amount to an unconstitutional retroactive application of the law. The supreme court disagreed. Quoting *Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683, 1687 (1948), the court stated:

> [T]he fact that one of the convictions that entered into the [defendant's sentencing] calculations ... occurred before the Act was passed [does not make] the Act invalidly retroactive[.] The [defendant's] sentence as a [repeat] offender or habitual criminal is not to be viewed as either a new jeopardy or [an] additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because [it is] a repetitive one.

*Danks*, 619 P.2d at 722. This is the accepted view on this matter, both as to increased punishments and to new offenses that include, as an element of the crime, proof that the defendant was previously convicted of an offense:

> If the defendant commits crime A at a time when there is no habitual criminal statute, then such a statute is passed imposing increased punishment for a second offense, and then the defendant commits crime B, it is not within the ex post facto prohibition to apply the habitual criminal statute to crime B. No additional punishment is prescribed for crime A, but only for the new crime B, which was committed after the statute was passed. *Similarly, it is permissible to define a crime as limited to certain conduct engaged in by persons who have theretofore been convicted of some other offense and to apply the statute to one whose earlier offense and conviction predated the enactment of this [new] statute.*

Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), § 2.4, Vol. 1, p. 139 (emphasis added).

■ Petersen's case is slightly different: his offense became first-degree stalking, not strictly because of his prior criminal conviction, but because he was on probation from that prior conviction and because one of his conditions of probation forbade him from having contact with R.H.. *Compare* AS 12.55.155(c)(20) (for purposes of presumptive sentencing, an offense is aggravated if "the defendant ... was on parole or probation for another felony"). Nevertheless, the same rule applies: the legislature can validly enhance the degree of a defendant's crime based on the defendant's pre-existing conditions of probation or based on a restraining order previously entered against the defendant. We therefore reject Petersen's contention that there was any illegality in convicting him of first-degree stalking because he violated a condition of probation imposed before the stalking law took effect. This did not constitute a retroactive application of the stalking law.

■ Petersen argues that the trial judge should have instructed the jury on certain lesser offenses. A defendant is entitled to a jury instruction on a lesser included offense when (1) the defendant necessarily committed the lesser offense if he or she committed the charged offense in the manner alleged by the State; (2) the defendant actually disputes the element or elements distinguishing the charged offense from the lesser, and (3) the evidence would support a reasonable conclusion that the defendant is guilty of only the lesser offense and not the charged offense. *State v. Minano*, 710 P.2d 1013, 1016 (Alaska 1985); *Elisovsky v. State*, 592 P.2d 1221, 1225 (Alaska 1979); *Blackhurst v. State*, 721 P.2d 645, 648 (Alaska App.1986).

■ Petersen contends that his jury should have been instructed on the lesser offense of second-degree stalking. As explained above, the State alleged that Petersen was guilty of first-degree stalking under AS 11.41.260(a)(2) because his acts of stalking were also violations of the condition of probation that prohibited him from having contact with R.H.. Petersen suggests that the jury might have concluded that his contacts with R.H. in various public places were "chance encounters". He argues that if he encountered R.H. by chance, then these en-

434

counters did not constitute violations of the no-contact order.

However, if Petersen's encounters with R.H. were inadvertent, if they were only chance meetings in public places, then Petersen would not be guilty of either first- or second-degree stalking. The stalking statutes require proof that the defendant "knowingly" engaged in nonconsensual contact with the victim. If the jury viewed the case as Petersen suggests, then they should have acquitted him, not convicted him of the lesser degree of stalking.

Petersen also contends that an instruction on second-degree stalking was needed because the jury might have found that Petersen was not on probation. This argument was not preserved for appeal. At the close of the evidence, Petersen's attorney did submit a proposed instruction on second-degree stalking, but he had no argument to support it:

THE COURT: [Defendant's proposed] instruction number 2 is ... stalking in the second-degree?

DEFENSE ATTORNEY: Mm-hm. It's the misdemeanor.

PROSECUTOR: The State would be opposed.

THE COURT: All right. What is the State's response to ... defendant's [proposed] instruction number 2?

PROSECUTOR: Under *Willett v. State,* [836 P.2d 955, 958 (Alaska App.1992),] the trial court's required [to instruct the jury on a] lesser included offense when, quote, "there is a factual dispute as to an element of the greater offense so that the jury could rationally acquit on the greater and convict on the lesser." ... Here, the only element that's different between Stalking One and Stalking Two is [the] existence of a court order. That court order, the [court] took judicial notice of. There has been no attack on that element by cross[-examination] or by [evidence in] the defendant's case.... As I recall, [this issue was not] brought up in any of the witnesses' testimony, save [when] Officer Shore was referring to it. I don't think a reasonable juror, in light of the evidence

that was presented at trial, can find that the existence of a court order is in doubt.

THE COURT: Mr. [Defense Attorney], your response.

DEFENSE ATTORNEY: I don't have any, Your Honor.

The trial judge accordingly denied Petersen's request for a second-degree stalking instruction.

■■ By declining to argue the point or provide any rationale for giving a second-degree stalking instruction, the defense attorney forfeited any claim of error. *See* Alaska Criminal Rule 30(a); *Cornwall v. State,* 915 P.2d 640, 653 n. 11 (Alaska App. 1996) (when a party offers a jury instruction but fails to provide any support for it when the trial judge indicates that the instruction may not be given, the party forfeits the right to assert that the trial judge should have given the instruction). *See also Hohman v. State,* 669 P.2d 1316, 1325–26 (Alaska App. 1983) (when a party offers evidence which is challenged for lack of relevance, and the offering party fails to make an offer of proof concerning the potential relevance of the challenged testimony, the party thereby forfeits the point on appeal). We further note that, even on appeal, Petersen fails to point to any evidence suggesting a dispute concerning the condition of probation that forbade him from contacting R.H..

■■ Petersen also contends that the jury should have been instructed on disorderly conduct under AS 11.61.110(a)(6); this statute forbids a person from "recklessly creat[ing] a hazardous condition for others by an act which has no legal justification or excuse". Petersen concedes that the elements of stalking do not include the creation of a "hazardous condition for others", and that the State could prove Petersen guilty of stalking without proving that he committed the crime of disorderly conduct. If a jury could rationally acquit the defendant of the purported lesser offense but at the same time convict the defendant of the greater offense, then the lesser offense is not "necessarily included" in the greater. *State v. Minano,* 710 P.2d at 1016. Thus, disorderly conduct was not a lesser included offense of stalking.

Petersen argues that the trial judge committed error when she took judicial notice of the fact that Petersen was on probation and that one of the conditions of his probation forbade him from contacting R.H.. The roots of this issue are found in a pre-trial motion that Petersen filed.

Before trial began, Petersen asked the trial judge to preclude the State from making "any mention or reference to" his April 1993 assault conviction (for attempting to ram R.H.'s car). In making this request, Petersen offered to stipulate that he was under a "court order" that prohibited him from approaching R.H.'s house or workplaces. The defense attorney argued that the fact of Petersen's conviction was irrelevant; what mattered (under the first-degree stalking statute) was that Petersen was under a court order not to contact the alleged victim. The prosecutor responded that stipulation to a "court order" was not sufficient: Petersen was charged with first-degree stalking under AS 11.41.260(a)(2), and this statute requires the State to prove that Petersen's conduct violated a specific type of court order—a condition of probation. Petersen's attorney continued to insist on a stipulation to a "court order". The trial judge ruled that the State could not introduce evidence of Petersen's conviction *per se*, but the judge also ruled that the State was not obligated to accept the proposed stipulation. *See State v. McLaughlin*, 860 P.2d 1270 (Alaska App.1993).

Later, during the presentation of the State's case, the prosecutor asked the judge for permission to introduce evidence of Petersen's assault conviction and his conditions of probation. The defense attorney objected. He noted that the judge had already ruled that the State could not introduce evidence of Petersen's conviction—although he conceded that there was a certain inconsistency in saying that the State could not introduce evidence of Petersen's conviction but that the State was still entitled to introduce evidence that Petersen was on probation. The judge replied, "I think you're right. . . . And therefore, both the conviction and the probation condition come in."

Upon hearing this, Petersen's attorney renewed his argument that the jury should be told only that "the district court said he couldn't have contact [with R.H.], not that he was on probation". The judge replied that the statute required proof that Petersen had violated a condition of probation. She asked the defense attorney if he had any objection to the following statement:

On April 7, 1993, the district court placed Gary Petersen on probation for five years and ordered him to have no contact with [R.H.], including not being within one block of her places of employment or her residence.

Petersen's attorney responded, "None"—that is, he said that he had no objection to the statement. The judge then declared that she would read this statement to the jury at the close of the current witness's testimony. The defense attorney made no immediate comment. However, a few minutes later he told the judge that, when he said "none", he meant only that he had no objection to the court's proposed statement, given the court's earlier ruling that the State was entitled to prove that Petersen had violated a condition of probation (not just a "court order"). The defense attorney stated that he was not "waiving anything". The judge replied that she was entitled to take judicial notice of Petersen's conditions of probation because they were established beyond reasonable dispute by documents in Petersen's district court file. The defense attorney did not respond to the judge's statement that she was going to take judicial notice of Petersen's conditions of probation.

Later in the trial, the prosecutor asked the judge to read the above-quoted statement about Petersen's probation to the jury. The judge did so without objection from Petersen's attorney.

On appeal, Petersen does not dispute the trial judge's authority to take judicial notice of the starting date, length, and conditions of Petersen's probation. *See Lemon v. State*, 522 P.2d 160, 162–63 (Alaska 1974) (upholding a judge's authority, in an escape prosecution, to take judicial notice of the defendant's prior conviction and sentence, thus establishing that the defendant had escaped from a jail to which he had been confined "by direction of a court"). However, Petersen con-

tends that the trial judge misinstructed the jury concerning the evidentiary effect of these judicially noticed facts.

The judge gave two jury instructions that are pertinent to Petersen's claim. Jury Instruction No. 4 told the jurors that they were the ones who must ultimately evaluate the credibility and effect of all evidence, including judicially noticed facts:

> [E]vidence is presented to you because it is the jury's exclusive duty to decide what facts of this case have been proved beyond a reasonable doubt and to apply the appropriate law to those facts....

> The court will rely on you to determine the facts. This must be done ... solely from a fair consideration of the evidence presented to you. There are five sources from which evidence may be presented to you: (1) the sworn testimony of witnesses ...; (2) all exhibits admitted into evidence ...; (3) facts, if any, admitted to or stipulated to by the attorneys; (4) all facts, if any, of which the court takes judicial notice; and (5) the presumptions stated in these instructions.

Jury Instruction No. 23, however, prescribed a more limited role for the jury with regard to certain facts:

> I have told you that it is up to you to decide what evidence you believe and the weight to be given [that evidence]. However, you must take as true the facts that the parties have agreed on and the facts that I have told you the law requires you to accept. It is for you to decide how these facts fit together with the evidence in the case and how much weight to give these facts.

At the close of the evidence, the judge distributed her proposed jury instructions so that the parties could review them. When the judge asked whether there was any objection to Instruction 23, both the prosecutor and the defense attorney answered "no".

Petersen concedes that he did not object to Instruction 23. Nevertheless, Petersen contends that the trial judge committed plain error by giving this instruction; he argues that this instruction told the jurors that they must accept judicially noticed facts as true.

Alaska Evidence Rule 203(c) establishes two different rules for judicially noticed facts. In civil cases, "the court shall instruct the jury to accept as conclusive any fact judicially noticed". However, in criminal cases, "the court shall instruct the jury that it may, but it is not required to," accept judicially noticed facts. This court has held that, even in the absence of an objection, a trial judge's violation of this rule (by telling a criminal jury that they are bound by judicially noticed facts) constitutes plain error. *Rae v. State*, 884 P.2d 163, 166–67 (Alaska App. 1994).

Here, however, we do not find plain error. The trial judge never explicitly told the jurors that they were bound to accept judicially noticed facts. Rather, Instruction 23 told the jurors that they were bound to accept "facts that the parties have agreed on and the facts that I have told you the law requires you to accept". Under this instruction, there were two categories of facts that the jury was bound to accept: any facts to which the parties stipulated, and any other facts that the judge expressly told the jurors they were required by law to accept.

The parties did not stipulate to the facts surrounding Petersen's probation. (It was this lack of a stipulation that led the court to take judicial notice.) And even though, during trial, the judge announced that she was taking judicial notice of the facts surrounding Petersen's probation, the judge never instructed the jurors that judicially noticed facts were the type of facts that "the law require[d] [them] to accept".

Lawyers familiar with the concept of judicial notice, and familiar with the role judicial notice plays in a civil trial, might interpret the phrase "facts ... the law requires [the jury] to accept" as a reference to judicially noticed facts. However, this connection would not be apparent to a jury of lay people. Moreover, the record in Petersen's case indicates that Petersen's attorney did not draw this connection. Even though the defense attorney vociferously challenged the State's efforts to introduce evidence of Petersen's status as a probationer and Petersen's conditions of probation, and even

though he challenged the court's decision to take judicial notice of these facts, he did not object to Instruction 23. While one could argue that Instruction 23 was potentially subject to erroneous construction, there was no obvious error in the instruction.

Further, the potential for error was all but erased by an incident that occurred during jury deliberations. During deliberations, the jurors asked the court to provide them with a copy of the district court order of April 7, 1993 that placed Petersen on probation. After hearing the positions of the parties, Superior Court Judge Peter A. Michalski (acting in the absence of the original trial judge) told the jurors that the order they sought was not part of the evidence. Judge Michalski then re-quoted the text of the judicial notice concerning Petersen's probation, and he specifically directed the jurors to consult Instruction 4. As noted above, Instruction 4 correctly informed the jurors that it was "the jury's exclusive duty to decide [the] facts of this case" based on the evidence, and that judicially noticed facts were simply one portion of the evidence that the jury could consider.[12] Given the wording of the original instructions, and given Judge Michalski's answer to the jurors, Petersen has not shown that the potentially ambiguous wording of Instruction 23 constituted an obvious or substantially prejudicial error. *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989).

For these reasons, we affirm Petersen's conviction.

### *Petersen's Sentence Appeal*

▮ Petersen's crime, first-degree stalking, is a class C felony with a maximum penalty of 5 years' imprisonment. AS 11.41.260(c); AS 12.55.125(e). Superior Court Judge Karen L. Hunt sentenced Petersen to 5 years with 2 years suspended (3 years to serve). Petersen contends that this sentence is excessive.

Petersen was a first felony offender. Under AS 12.55.125(k) and *Austin v. State*, 627 P.2d 657 (Alaska App.1981), as construed in *Brezenoff v. State*, 658 P.2d 1359, 1362 (Alas-

ka App.1983), Petersen could not receive 3 years to serve unless the sentencing judge found one or more of the aggravating factors listed in AS 12.55.155(c) (or unless the judge found extraordinary circumstances under AS 12.55.165). Judge Hunt found two aggravating factors: (c)(9)—that Petersen knew that his offense involved more than one victim, and (c)(21)—that Petersen had a history of repeated criminal violations similar in nature to his present offense.

Petersen argues that the record does not support aggravator (c)(21) (repeated similar criminal violations). He acknowledges that he has two prior convictions involving R.H.— the 1992 trespass conviction and the 1993 assault conviction—but he points out that he received a suspended imposition of sentence for the trespass conviction and this conviction was ultimately set aside. Petersen argues that a set-aside conviction should not be counted toward his criminal history under aggravator (c)(21).

▮ This court has consistently interpreted aggravator (c)(21) to encompass all of a defendant's prior crimes, whether or not the defendant was prosecuted for those crimes. *See Turpin v. State*, 890 P.2d 1128, 1132 (Alaska App.1995); *Fagan v. State*, 779 P.2d 1258, 1260 (Alaska App.1989). Thus, the sentencing court would have been authorized to consider Petersen's 1992 trespass at R.H.'s house even if Petersen had never been prosecuted for this offense. We see no rationale for interpreting AS 12.55.155(c)(21) differently when the defendant has been convicted of a prior crime, even when the conviction is ultimately set aside under the provisions of a suspended imposition of sentence. We therefore uphold Judge Hunt's finding of aggravator (c)(21).

Petersen also argues that the record does not support aggravator (c)(9) (that he knew the offense involved more than one victim). Judge Hunt found aggravator (c)(9) because several of Petersen's acts of stalking also involved R.H.'s husband and R.H.'s children. Petersen admits that other members of

---

12. We view this instruction as the functional equivalent of the instruction called for by Evidence Rule 203(c)—that the jury may accept judicially noticed facts but is not required to do so.

R.H.'s family were present during some of his contacts with R.H., but he argues that the contacts involving other family members all occurred before the effective date of the stalking statute (that is, these were not acts for which Petersen could be charged). Petersen argues that, in the absence of clear evidence that other family members were present during his contacts with R.H. after May 28, 1993, the State could not establish aggravator (c)(9).

The record does not support Petersen's claim that all of his contacts with R.H. after May 28, 1993 involved R.H. alone. The State points out that R.H.'s children were with her on July 3, 1993, when Petersen approached R.H. twice at the Bear Paw Festival. The State also points out that R.H.'s children were with her on the day of Petersen's arrest one week later (July 18, 1993), when R.H. came home and found Petersen and Officer Shore in the family's driveway.[13] Moreover, the sentencing record contains evidence that R.H.'s children were fearful for their mother's safety, and for their own safety, because of Petersen's actions.

Under AS 11.41.270(b)(1), the "course of conduct" that constitutes the actus reus of stalking is defined as "repeated acts of non-consensual contact involving the victim *or a family member*". (Emphasis added) The record is sufficient to support findings that R.H.'s children were present during more than one of Petersen's post-May 1993 acts of nonconsensual contact with R.H., that Petersen's conduct placed the children in fear for their own safety or the safety of their mother, and that Petersen acted with recklessness concerning this result.

Nevertheless, aggravator (c)(9) is troublesome when applied to stalking prosecutions. When a person is stalked, the stalking almost inevitably affects the person's family, close friends, and co-workers. As these other people become aware of the stalking and come to realize that their association with the targeted victim puts them in the stalker's path, they may justifiably become concerned for their own safety as well as for the safety of the targeted victim. If these other people are considered victims of the stalking, then stalking will rarely (if ever) involve only one victim.[14]

One portion of the stalking statute seems to indicate that family members, friends, and co-workers are not to be considered "victims" of the stalking. AS 11.41.270(b)(4) defines "victim" as a person who is the "target" of repeated acts of nonconsensual contact. On the other hand, AS 11.41.270(a) declares that stalking is committed when a defendant, through repeated acts of nonconsensual contact, "recklessly places *another person* in fear of death or physical injury". If "another person" is read to mean "any other person", then a defendant who targets one person but whose conduct places many people in fear of injury or death may conceivably have committed many counts of stalking. *Compare Cooper v. State*, 595 P.2d 648, 649–650 (Alaska 1979) (a defendant who commits one assaultive act can be convicted of a separate count of assault for each person placed in fear).

We find that we do not need to resolve these issues in Petersen's case. Even assuming that R.H. was Petersen's only victim for purposes of the stalking statute, or even assuming that stalking almost inevitably involves other victims (so that aggravator (c)(9)

---

**13.** When a defendant's knowledge of a circumstance is at issue, knowledge of that circumstance is established if the defendant was "aware of a substantial probability of its existence". *See* AS 11.81.900(a)(2). Petersen knew that R.H. had minor children. While Petersen might not have known to a certainty that he would encounter R.H.'s children when he came to R.H.'s house on July 18, 1993, the record supports a finding that Petersen was aware of a substantial probability that R.H.'s children would be with her.

**14.** We note that AS 11.41.270(b)(2) defines "family member" as:

(A) [a] spouse, child, grandchild, parent, grandparent, sibling, uncle, aunt, nephew, or niece of the victim, whether related by blood, marriage, or adoption;

(B) [a] person who lives, or has previously lived, in a spousal relationship with the victim;

(C) [a] person who lives in the same household as the victim; or

(D) [a] person who is a former spouse of the victim or is or has been in a dating, courtship, or engagement relationship with the victim[.]

should have received little or no weight, *see Pusich v. State*, 907 P.2d 29, 39 (Alaska App.1995)), Petersen's sentence is amply justified without reference to aggravator (c)(9). We are convinced that, even if the sentencing court erred in finding aggravator (c)(9), this error had no appreciable effect on Petersen's sentence.

As discussed above, Judge Hunt found a separate aggravator, (c)(21), based on Petersen's two prior crimes against R.H. (trespass in 1992, assault in 1993). This aggravating factor authorized her to consider sentences above the *Austin* limit. *Brezenoff v. State*, 658 P.2d 1359, 1362 (Alaska App.1983).

As this court has repeatedly stated, the presence of aggravating factors does not necessarily justify a substantial departure from the presumptive terms established by the legislature. *See Pusich*, 907 P.2d at 39. By analogy, proof of aggravating factors does not necessarily call for a sentence above the limit established in *Austin* for a first felony offender like Petersen. Having found aggravator (c)(21), Judge Hunt's next task was to weigh that factor in light of the sentencing criteria codified in AS 12.55.005 to determine whether the presence of the aggravator showed Petersen to be an atypically serious offender or showed his crime to be more serious than a typical instance of first-degree stalking. *See Juneby v. State*, 641 P.2d 823, 833, 835 & n. 21 (Alaska App.1982), *modified on other grounds*, 665 P.2d 30 (Alaska App. 1983) (in cases governed by presumptive sentencing, even when aggravating factors are proved, a sentencing court should be cautious when making adjustments to the prescribed presumptive term; any adjustment should be based on the sentencing criteria established in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970)).

In the present case, Petersen's two prior crimes comprise only a minor aspect of Petersen's long-term assault on R.H.'s privacy and security. Technically speaking, Petersen stalked R.H. for only a few weeks (because the stalking statutes did not take effect until May 28, 1993). However, Petersen terrorized R.H. for much longer than that.

For more than two years (from the spring of 1991 until his arrest in July 1993), Petersen hounded R.H.. Peterson followed R.H., he spied upon her, he unexpectedly confronted her, and one time he assaulted her (by attempting to ram her car). He intruded upon her at her home, at her workplace, when she did her shopping, and when she went out for recreation with family and friends. He ignored R.H.'s repeated requests to stay away from her, he ignored a very pointed letter from the Kanady Clinic (quoted in footnote 1 above), and he ignored the conditions of probation imposed on him in 1992 and 1993. Petersen also failed to follow through with the psychiatric counseling that he had been ordered to continue as a condition of probation in 1993.

The record fully supports Judge Hunt's conclusion that Petersen inflicted two years of psychological violence on R.H.; the record also fully supports her conclusion that Petersen's prospects for rehabilitation were "extremely guarded".

Admittedly, Petersen's appeal is this court's first sentence appeal from a first-degree stalking conviction; we therefore have no history of first-degree stalking sentences to use as a point of comparison. However, Petersen's conduct was substantially more serious than the conduct minimally required for conviction of first-degree stalking, and his prospects for rehabilitation are quite poor. We can not say that a sentence of 3 years to serve is clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

*Conclusion*

The judgments entered against Petersen, Larson, and Colbry are AFFIRMED.