**Joel Morris KENISON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8567.**

Court of Appeals of Alaska.

Feb. 11, 2005.

---

Rex Lamont Butler, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Joel Morris Kenison appeals his conviction for first-degree stalking.[1] He contends that the State presented insufficient evidence to the grand jury to support his indictment. Kenison further contends that his trial judge committed error by allowing the State to introduce evidence of various instances of Kenison's past conduct toward the victim, his estranged wife. Kenison also argues that the trial judge should not have allowed the State to amend the indictment at the close of the trial, altering the dates of the stalking to conform to the evidence presented at trial. In addition, Kenison argues that the trial judge should have declared a mistrial based on statements made by the prosecutor during the government's summation to the jury. Finally, Kenison asserts that the trial judge should have given the jury a special instruction on the meaning of the term "fear".

For the reasons explained here, we reject each of Kenison's assertions of error, and we accordingly affirm his conviction.

### Underlying facts

Joel and Mary Ann Kenison married in 1989. They separated in August 1998, and they formally divorced two years later.

---

1. AS 11.41.260(a).

Following the couple's separation in August 1998, Joel Kenison repeatedly sought a reconciliation with his estranged wife. Kenison also began to harass and threaten Mary Ann, focusing particularly on her relationships with other men. Mary Ann obtained several protective orders (at various times) against Kenison. But despite these protective orders, Kenison's harassing and threatening behavior did not cease; it continued until Kenison's arrest in December 2001.

*(a) The couple's separation, and the events leading up to the first protective order (November 1998)*

Mary Ann testified that the Kenisons' marriage had been in trouble for several years when she finally moved out of the marital home in August 1998. Mary Ann stated that she did not inform Kenison of her new address because she was afraid of him.

Immediately after the separation, Kenison made repeated attempts to reconcile with Mary Ann, but she remained adamant in her desire to separate from him. During this period, Kenison made many telephone calls to Mary Ann. Kenison sometimes placed these calls at all hours of the day; Mary Ann testified that, at times, her phone continued to ring after midnight.

In these calls, Kenison repeatedly accused her of leaving him for another man. Kenison went so far as to threaten to kill one of Mary Ann's co-workers (because Kenison suspected that Mary Ann was dating this co-worker). Kenison also threatened to stop all involvement with the couple's two children if Mary Ann continued to see other men, and he threatened to burn down the marital home. And, on occasion, Kenison threatened to commit suicide if Mary Ann did not come back to him.

Mary Ann testified that she was scared by the number and the content of Kenison's telephone calls, especially his repeated threats of violence. She stated that "[she] had no idea what he might do." For this reason, Mary Ann began to tape record Kenison's calls.

Kenison's harassment of Mary Ann was not limited to telephone calls. Kenison drove by Mary Ann's residence twice when Mary Ann was entertaining a friend for dinner one evening. On another occasion, during a period when Kenison was repeatedly calling her house, Mary Ann saw someone running out of her yard and down the street. When she went out to check, she observed footprints leading up to her window.

On November 7, 1998, Kenison drove by Mary Ann's residence when she was entertaining a guest, and then he telephoned her and made threats to harm her guest. Mary Ann called the police that night. She testified that "[she] was very scared that [Kenison] was going to come over to [her] residence and hurt [her]."

Ten days later, on November 17th, Mary Ann petitioned the court for a 20–day protective order against Kenison. The order was granted, and Kenison was served with this protective order on December 3rd. When this protective order expired on December 7th, Mary Ann did not seek a six-month order. She explained that she "just wanted to get [Kenison's] attention ... so that he [w]ould realize that his behavior was harmful and inappropriate."

*(b) The events leading up to the second set of protective orders (June and July 1999)*

While the November 1998 protective order was in effect, Kenison abided by its terms. But when the protective order expired, Kenison again began to call Mary Ann and to write her letters. Mary Ann responded by trying to limit her communication with Kenison to a minimum. She did not return his phone calls, and she ignored his letters. She also arranged child visitation schedules so that she would not have to meet with Kenison face-to-face.

This policy apparently worked for several months. But in May 1999, Mary Ann started dating another man, G.N. Kenison called Mary Ann and left angry messages regarding this relationship. As before, Kenison threatened to hurt or kill Mary Ann's male friends (both G.N. and one of Mary Ann's co-workers). He also threatened to refuse to be involved with the children if she continued to date G.N. And Kenison threatened to com-

mit suicide if Mary Ann did not return to him.

Kenison also began driving by Mary Ann's residence for no apparent reason, often with their children in the car.

Kenison also targeted G.N. for harassing phone calls. On three occasions, G.N. answered the phone at his house only to be greeted by an open, silent line. Two of these calls occurred when Mary Ann was visiting G.N.'s house.

As a result of Kenison's harassing and threatening conduct, Mary Ann sought and obtained another 20–day protective order on June 18, 1999. The order was served on Kenison two days later.

Mary Ann testified that Kenison violated the "no communication" provision of this protective order on two occasions. Once, Kenison telephoned Mary Ann, ostensibly to check on their children's welfare. And once, Kenison sent a letter to Mary Ann, seeking reconciliation with her.

This time, when the 20–day protective order expired, Mary Ann sought and obtained a six-month protective order. This order was signed on July 6, 1999. Under the terms of the six-month order, Kenison was prohibited from visiting Mary Ann's house and her place of employment. Further, all of Kenison's communications with Mary Ann—including any communications involving their children—were to be conducted through an intermediary, Mary Ann's brother.

According to Mary Ann, Kenison generally conformed his behavior to the terms of this six-month protective order. The harassing telephone calls stopped while the order was in effect—although Mary Ann suspected that Kenison continued to drive past her residence. (Apparently, their son later confirmed Mary Ann's suspicion.)

### (c) The events leading up to the third set of protective orders (October 2000)

In August 2000, Mary Ann started seeing another man. This event prompted Kenison to resume his campaign of harassment and threats.

Mary Ann happened to meet this man shortly before she was to go on a three-week vacation. Kenison apparently did not view this timing as coincidental. He telephoned Mary Ann on the day that she was scheduled to leave on her trip. Screaming and yelling, Kenison threatened that he would refuse to take care of their children while she was away. He accused Mary Ann of running off to get married.

Shortly after she returned from this vacation, Mary Ann invited her new boyfriend over for dinner. According to her testimony, as soon as the man arrived at her house, her telephone began ringing "off the hook": it was Kenison. Kenison demanded to know what Mary Ann was doing with a man in her house. Mary Ann hung up, but the calls continued until she unplugged her phone. Later, when the man was getting ready to leave Mary Ann's home, he discovered that his vehicle had a flat tire.

After this incident, Kenison continued to make harassing phone calls to Mary Ann. Kenison's phone calls were so relentless that Mary Ann was forced to unplug her telephone in the evening so that she could get a good night's sleep. Mary Ann testified that Kenison's possessiveness and his jealousy were "very ... scary and very threatening."

On October 1, 2000, Mary Ann obtained a 20–day protective order against Kenison. (This order was served on Kenison three days later.) Eighteen days later, Mary Ann obtained a six-month protective order against Kenison.

### (d) The events leading up to the fourth set of protective orders (May and June 2001)

Despite this third set of protective orders, Mary Ann continued to receive numerous hang-up telephone calls, both at home and at her work. These calls were now coming from unidentified numbers. When Mary Ann sought advice from local agencies who assist domestic violence victims, the agencies told her to write down whatever information about these calls was displayed on her caller-ID screen. Mary Ann did so, and she discovered that many of the calls were originating from pay phones in her neighborhood. In

March 2001, Mary Ann wrote a letter to Kenison in which she confronted him with this information. Kenison denied that he was the one calling her. The calls continued.

Also in March 2001, Mary Ann started dating A.B. In April, she made plans to celebrate her birthday by going out to dinner with A.B. As Mary Ann drove to meet A.B., she noticed that Kenison was driving next to her, waving at her. Mary Ann tried to lose Kenison by exiting the freeway, but Kenison followed her, even though he had to cross multiple lanes of traffic to do so. Mary Ann eventually had to pull over and stop—at which point, Kenison drove away.

A.B. also became a target of Kenison's harassment. A.B. began to receive harassing telephone calls on both his business and his personal phone lines at his home. A.B. testified that, when he answered these calls, there would be silence on the other end of the line. The calls would usually come in spurts.

In addition, the tires of A.B.'s vehicle were slashed on two occasions that spring. One of these occasions was on the morning after A.B. and Mary Ann went on a date. On the second occasion, the slashing occurred while Mary Ann's vehicle was also parked at A.B.'s residence, and her vehicle also suffered two flat tires. (The other three cars in the same parking lot sustained no tire damage.)

Mary Ann reported this incident to the police on May 25, 2001. That same day, Mary Ann obtained yet another protective order against Kenison. This order was served on Kenison on May 31, 2001. Four days later (June 4th), Kenison violated this order by writing a letter to Mary Ann. On June 11th, the court granted Mary Ann a six-month protective order. Like the previous orders, this one prohibited Kenison from having any contact with Mary Ann, with the exception of written communications involving their children. In addition Kenison was prohibited from visiting Mary Ann's residence and A.B.'s residence.

*(e) The events leading up to Kenison's arrest on the evening of December 7–8, 2001*

During the summer of 2001, Kenison engaged in multiple contacts with Mary Ann.

She began receiving hang-up calls from pay phones in the area. She also received a note from Kenison in which he expressed anger that she had (purportedly) amended the child custody schedule to accommodate her social life.

In July 2001, when Mary Ann went to the day care center to pick up their daughter, she found that Kenison was behind her. Kenison attempted to engage her in conversation. Later that same month, Mary Ann encountered Kenison when she went to pick up their son from a basketball camp. And on August 17th, while Mary Ann was hosting a dinner party at her house, A.B. looked out the window and saw Kenison slowly driving down the cul-de-sac.

In late September, Mary Ann went to hear A.B. play music. While she was there, she was paged two or three times. She also continued to receive hang-up telephone calls.

In late October 2001, Mary Ann went to breakfast with A.B. and a third person. When Mary Ann left the restaurant, she saw Kenison across the street, waving at her. Mary Ann ignored him and got into her car. Kenison, with their children in the car, followed her. As they drove, Kenison pulled up beside her and shouted obscenities at her.

On December 1, 2001, A.B. suffered a third tire slashing. He filed a police report concerning this incident on December 3rd. In the week that followed, A.B. received more harassing phone calls than ever before.

Also in early December, Mary Ann became concerned because Kenison had failed to drive their children to school. When Mary Ann telephoned Kenison to check on the children, Kenison told her that the children were fine, and then he began to question her about A.B.

On the night of December 7, 2001, Mary Ann visited A.B.'s residence. Shortly after she and A.B. entered the residence, the two telephone lines began "ringing off the hook". After answering two or three calls, and being met with silence on the other end of the line, A.B. called the police.

While Mary Ann and A.B. waited for the police to arrive, the phone continued to ring. When A.B. answered the phone, Kenison spoke to him—although he identified himself as "Bill Clinton". With anger in his voice, Kenison demanded to talk to Mary Ann, but she refused to speak with him.

The police arrived around eleven o'clock. By that time, Mary Ann was frightened, tired, and upset; she estimated that Kenison had called the house a total of twenty times. By tracing another call that Kenison made shortly thereafter, the police were able to discover the number of the originating telephone. Mary Ann identified this number as belonging to Kenison's cell phone.

After the police confirmed that there was an outstanding protective order that prohibited Kenison from contacting Mary Ann, they arrested Kenison (either later that night or early the next morning).

Kenison was charged with violating the protective order, and he was also charged with first-degree stalking. Following a jury trial, Kenison was found guilty of both charges.

*Kenison's attacks on his indictment*

█ Before trial, Kenison filed a motion to dismiss his indictment; he argued that the evidence presented to the grand jury was insufficient to establish that he had committed the crime of first-degree stalking.

The basic crime of stalking (second-degree stalking) is defined in AS 11.41.270. Under subsection (a) of this statute, the crime consists of "knowingly engag[ing] in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member".

The phrase "course of conduct" is defined in subsection (b) of the statute. It means "repeated acts of nonconsensual contact involving the victim or a family member" [2]— with the proviso that "family member" includes any person who "is or has been in a

dating, courtship, or engagement relationship with the victim" [3]. The term "nonconsensual contact" is defined as "any contact with another person that is initiated or continued without that person's consent, [or] that is beyond the scope of the consent provided by that person, or that is in disregard of that person's expressed desire that the contact be avoided or discontinued" [4]. It includes such types of contact as following the person, or approaching or confronting the person, or appearing at the person's residence or workplace, or contacting the person by telephone, by mail, or by electronic communication [5].

In Kenison's case, the State alleged that his offense was aggravated to first-degree stalking under AS 11.41.260(a)(1), a provision that elevates the degree of the offense when "the actions constituting the offense are in violation of [a protective or restraining] order issued under AS 18.66.100–18.66.180".

The indictment returned against Kenison tracked the language of the pertinent statutes. The indictment charged that "on or about December 7, 2001, ... Kenison knowingly engaged in a course of conduct that recklessly placed another [person] in fear of death or physical injury, or in fear of the death or physical injury of a family member[,] and the conduct was in violation of an order issued under AS 18.66.100–18.66.180...."

Kenison argues that the indictment is deficient on its face because he did not commit a "course of conduct" on December 7, 2001. He concedes that the State presented evidence that he engaged in non-consensual contact with Mary Ann and A.B. on the evening of December 7th, but he argues that this conduct was a single act, not a "course of conduct". We conclude, for three reasons, that the indictment was not limited to the events of December 7th.

First, the indictment did not specify that Kenison's offense occurred precisely on December 7th. Rather, the indictment charged that Kenison's offense occurred "on or about" December 7th.

---

**2.** AS 11.41.270(b)(1).

**3.** AS 11.41.270(b)(2).

**4.** AS 11.41.270(b)(3).

**5.** *Id.*

Second, because the crime of stalking requires proof of a course of conduct, the crime will necessarily consist of a series of acts committed over time. See our discussion of this issue in *Cook v. State*, 36 P.3d 710, 720–22 (Alaska App.2001). When Kenison's indictment is read in a common-sense manner, in light of the evidence presented to the grand jury (which we describe below), the indictment charges that Kenison engaged in a lengthy series of harassment and threats that culminated on December 7, 2001.

Third, and most important, as we recently explained in *Larkin v. State*, 88 P.3d 153 (Alaska App.2004), the date of the offense is normally not a material element of the State's proof. A deficiency or inaccuracy in an indictment's specification of the date of the offense is generally immaterial, so long as the State's evidence reveals that the offense occurred (1) before the indictment was returned and (2) within the applicable statute of limitations.[6]

The problem is somewhat different in Kenison's case, because he was charged with first-degree stalking under the theory that his conduct violated a protective order. This means that the timing of Kenison's acts of non-consensual contact was potentially material.

Even though Mary Ann obtained several protective orders against Kenison during the three years between their separation (in August 1998) and Kenison's arrest (in December 2001), there were significant periods of time during this three-year span when no protective order was in place. To the extent that Kenison engaged in acts of non-consensual contact with Mary Ann or the men she was dating during the times when there was no protective order, this conduct could not form the basis for a charge of first-degree stalking.

We acknowledge that the superior court interpreted the first-degree stalking statute differently. The superior court held that Kenison could properly be convicted of first-degree stalking if any *one* of his acts of non-consensual contact violated a protective or-

der. We disagree. The crime of stalking requires proof of a "course of conduct"—that is, proof of "repeated acts of nonconsensual contact".[7] And the pertinent clause of the first-degree stalking statute, AS 11.41.260(a)(1), requires proof that *"the actions constituting the offense* [were] in violation of [a protective] order". (Emphasis added.) Reading these two statutes together, we conclude that the State was required to prove that Kenison engaged in a course of conduct whose constituent acts of non-consensual contact violated one or more of the protective orders issued in this case.

Nevertheless, the evidence presented to the grand jury was sufficient to establish that Kenison engaged in a series of non-consensual contacts with Mary Ann and the man she was dating, A.B., between May 25, 2001 (the date when the fourth set of protective orders first took effect) and the evening of December 7–8, 2001 (the date of Kenison's arrest, when that fourth set of protective orders was still in effect).

Mary Ann was the principal witness at the grand jury. She chronicled Kenison's threatening and harassing behavior over the course of more than three years. She also explained that she obtained several protective orders against Kenison because his actions frightened her, and because she feared that he would harm her or the men she was dating.

The final set of protective orders was issued in May and June 2001. (As explained above, Mary Ann obtained the initial 20–day protective order on May 25, 2001, followed by the six-month protective order issued on June 11, 2001.) At the grand jury, Mary Ann detailed Kenison's many violations of these protective orders. Kenison made numerous hang-up telephone calls to A.B., he paged Mary Ann when she attended one of A.B.'s musical performances, he followed Mary Ann (and cursed at her) after she had breakfast with A.B. on October 28th, he slashed A.B.'s tire on December 1st, and he made the telephone calls to A.B.'s residence on the evening of December 7th—the contact that ultimately resulted in his arrest.

6. *Larkin*, 88 P.3d at 156–57.

7. AS 11.41.270(b)(1).

This evidence was sufficient to support a finding that, in the months leading up to December 2001, while the fourth set of protective orders were continuously in place, Kenison engaged in repeated acts of non-consensual contact with Mary Ann and A.B. (the man she was dating), and that this course of conduct ended with Kenison's arrest on the evening of December 7th–8th. In other words, this evidence was sufficient to support Kenison's indictment for first-degree stalking, even if we leave aside all of Kenison's conduct before May 25, 2001 (when the fourth set of protective orders took effect).

Kenison further attacks the sufficiency of the grand jury evidence on the basis that Mary Ann never expressly stated that Kenison's words and actions made her fearful. But when the stalking statute speaks of a course of conduct that places another person in "fear" of death or physical injury (or the infliction of death or injury on a family member), the statute is not referring to the victim's subjective feelings of fright or intimidation. Rather, the statute requires proof that the victim reasonably perceived or apprehended the threat of death or physical injury.

We explained this legal concept (in the context of Alaska's assault statutes) in *Hughes v. State*, 56 P.3d 1088 (Alaska App. 2002):

> It is true that the third-degree assault statute requires proof that the defendant "place[d] another person in fear of imminent serious physical injury". But, as used in this statute, the word "fear" does not refer to fright, dread, intimidation, panic, or terror. Rather, a person is "placed in fear" of imminent injury if the person reasonably perceives or understands a threat of imminent injury. The victim's subjective reaction to this perception is irrelevant. It does not matter whether the victim of the assault calmly confronts the danger or quivers in terror. The question is whether the victim perceives the threat.

*Hughes*, 56 P.3d at 1090 (footnote omitted).

This same rule applies to the crime of stalking. The State was not obliged to prove that Kenison's conduct made Mary Ann feel frightened or intimidated. Rather, the State was obliged to prove that Kenison's conduct caused Mary Ann to reasonably perceive or understand a threat of death or injury to herself or a family member. The evidence presented to the grand jury was sufficient to establish this element of the offense.

For these reasons, we conclude that the superior court properly rejected Kenison's challenges to the grand jury indictment.

*The trial judge's decision to allow the State to introduce evidence of Kenison's entire course of non-consensual contact with Mary Ann and her male friends, from the marital separation in August 1998 to the time of Kenison's arrest in December 2001*

At Kenison's trial, Mary Ann was allowed to explain the course of her relationship with Kenison from the summer of 1998 (when the couple separated) to the events leading to Kenison's arrest on the evening of December 7–8, 2001. In particular, Mary Ann described Kenison's many acts of non-consensual contact and his repeated harassment and threats during this period of more than three years.

Kenison's attorney objected to the introduction of any evidence concerning Kenison's conduct before 2000. The defense attorney contended that this pre–2000 conduct was irrelevant to the stalking charge. The attorney's argument was based on the assertion that a charge of stalking requires proof of an *uninterrupted* course of conduct.

The defense attorney pointed out that, according to Mary Ann's testimony, Kenison stopped harassing and threatening her after she obtained the third set of protective orders in June and July 1999. Mary Ann testified that Kenison did not resume his pattern of harassment and threats until a year later, in August 2000, when she started dating another man.

Based on this interruption in Kenison's pattern of harassment and threats, the defense attorney argued that Kenison had actually committed two separate "courses of conduct"—two separate series of non-consensual contacts. According to the defense attorney, Kenison had been indicted solely for the course of conduct that began in August 2000

and culminated in December 2001. Thus, the defense attorney contended, evidence of Kenison's conduct prior to the summer of August 2000 was irrelevant to the issues being litigated at Kenison's trial.

The trial judge, Superior Court Judge Michael L. Wolverton, rejected this argument and allowed Mary Ann to testify about all of the events described earlier in this opinion.

Kenison now challenges this ruling on appeal. Indeed, Kenison argues that the scope of admissible evidence may have been even narrower than suggested in the preceding discussion. Kenison points out that he was indicted for first-degree stalking under the theory that his conduct violated a protective order "on or about December 7, 2001". Based on this, Kenison asserts that evidence of his prior acts was relevant only if that evidence related to his conduct during the time when the fourth set of protective orders was in effect—*i.e.*, on or after May 25, 2001.

We addressed and rejected similar contentions in *Petersen v. State,* 930 P.2d 414 (Alaska App.1996), and *Cook v. State,* 36 P.3d 710 (Alaska App.2001). In both *Petersen* and *Cook,* we upheld trial court rulings that allowed the State to introduce evidence of the defendant's acts of non-consensual contact with the victim even though these acts were committed outside the range of time specified in the indictment.

In *Petersen,* the State introduced evidence detailing the defendant's interactions with the victim during the 4–year period from 1989 until the defendant's arrest on July 18, 1993, even though stalking did not become a crime under Alaska law until May 28, 1993 (the effective date of our two stalking statutes, AS 11.41.260 and 270).[8] Petersen argued that all of his contacts with the victim prior to May 28, 1993 were irrelevant to the crime charged in the indictment, and that this evidence served only to suggest that he was a person of bad character. Petersen therefore contended that this evidence should have been excluded under Alaska Evidence Rules 403 and 404(b)(1).

We rejected Petersen's contention that this evidence was irrelevant, or that it was relevant only to prove his bad character:

> The State was obliged to prove that Petersen knowingly engaged in nonconsensual contact with R.H. Obviously, R.H.'s reaction to Petersen's pre-May 1993 contacts (in particular, her explicit directions to Petersen that he stay away from her) were relevant to prove that Petersen was aware that R.H. did not consent to his post-May 1993 contacts with her.
>
> Additionally, the State was obliged to prove that R.H. was placed in fear of injury or death by Petersen's post-May 1993 contacts. Clearly, evidence of Petersen's long-standing course of conduct toward R.H.—his persistent refusal to stay away from her, his repeated presence at her workplace, his middle-of-the-night trespass at her home in January 1992, and his attempt to ram R.H.'s car in January 1993—was relevant to establish that R.H. feared injury or death at Petersen's hands.
>
> Finally, the State was obliged to prove that Petersen recklessly disregarded a substantial and unjustifiable risk that his conduct would cause R.H. to fear injury or death. Again, Petersen's pre-May 1993 conduct was relevant to prove this element of the offense.

*Petersen,* 930 P.2d at 432. Based on this reasoning, we concluded that evidence of Petersen's pre-May 1993 contacts with the victim R.H. was relevant for non-propensity purposes, and that the evidence was therefore not barred by Evidence Rule 404(b)(1).[9]

We addressed the converse problem in *Cook.* The defendant in *Cook* was charged with first-degree stalking for engaging in a series of non-consensual contacts with the victim in violation of a protective order. The indictment charged Cook with a course of conduct committed between late October 1998 (when the protective order was issued) and late December 1998 (when Cook was arrested). The trial judge allowed the State to introduce evidence that two months later, in February 1999, while Cook was in jail

---

**8.** *Petersen,* 930 P.2d at 420–21 & 432.

**9.** *Id.*

awaiting trial, Cook sent another letter to the victim in violation of the protective order.[10]

On appeal, Cook argued that this letter was irrelevant to the charge against him, since Cook did not send this letter until two months after the time period specified in the indictment. He further argued that "[t]he only impact [of] this letter ... was to suggest to the jury that [he] had a propensity to engage in unwanted contact with [the victim]."[11] We concluded that "[t]his is precisely why the letter was relevant and properly admitted":

> [The letter] tended to show Cook's continuing attitude toward [the victim], his attitude toward the protective order, and his continuing perception of his relationship with [the victim]—thus tending to prove Cook's state of mind from late October to late December 1998, when he committed the acts of non-consensual contact with which he was charged.

*Cook*, 36 P.3d at 723–24.

For the reasons explained in *Petersen* and *Cook*, we conclude that the disputed evidence in Kenison's case—*i.e.*, evidence of Kenison's deteriorating relationship with Mary Ann, and evidence of Kenison's series of non-consensual contacts with Mary Ann and her male friends, starting from the time of the marital separation in August 1998—was relevant to the stalking charge against Kenison, even if that charge is confined to Kenison's conduct between May and December 2001 (when the fourth set of protective orders was in effect). Because this evidence was relevant for non-propensity purposes, it was not barred by Evidence Rule 404(b)(1).

Kenison alternatively argues that, even if this evidence was admissible for non-propensity purposes, Judge Wolverton erred by not evaluating the various portions of the evidence under Evidence Rule 403—*i.e.*, balancing the probative value of each portion against its potential for unfair prejudice. Kenison claims that Judge Wolverton utterly failed to assess the admissibility of any of the evidence under Rule 403.

The record does not bear out this claim. Instead, the record shows that Judge Wolverton repeatedly engaged in a Rule 403 balancing process before deciding whether to allow the State to introduce various portions of this evidence.

Moreover, Kenison's assertion of unfair prejudice is basically a reiteration of his claim that the evidence was irrelevant. As we have explained here, the evidence was in fact relevant. Kenison has made no effort to identify individual portions of this evidence and show that these particular portions posed a specific danger of unfair prejudice. We accordingly conclude that Kenison has failed to demonstrate that he was unfairly prejudiced by this evidence.

Finally, Kenison argues that the admissibility of the disputed evidence should be evaluated by retroactively applying the standards we recently announced in *Bingaman v. State*, 76 P.3d 398 (Alaska App.2003). But *Bingaman* is not pertinent to the issue presented here.

In *Bingaman*, we examined and construed Alaska Evidence Rule 404(b)(4), a rule that applies to prosecutions for domestic violence and that allows the State to introduce "propensity" evidence that would otherwise be barred by Evidence Rule 404(b)(1). But, as we have just explained, the evidence of Kenison's relationship with Mary Ann, and the evidence of his prior acts of non-consensual contact with her and her male friends, was not "propensity" evidence. This evidence was relevant for purposes other than to prove Kenison's character, and it was therefore not barred by Evidence Rule 404(b)(1).

*Bingaman* addresses the scope of the exceptions to Evidence Rule 404(b)(1)—primarily, the exception codified in Evidence Rule 404(b)(4) and, to a lesser extent, the exceptions codified in Evidence Rules 404(b)(2), and (b)(3). The disputed evidence in Kenison's case was admissible without regard to any of these exceptions to Rule 404(b)(1). Thus, *Bingaman* is not pertinent to Kenison's case.

---

**10.** *Cook*, 36 P.3d at 714–15 & 723.

**11.** *Id.* at 723.

*The superior court's decision to allow the State to amend the stalking charge at the close of Kenison's trial*

■ Under Alaska Criminal Rule 7(e), a trial judge has the authority to allow the State to amend the indictment at any time before the jury returns its verdict, so long as the amendment does not alter the indictment to charge an additional or different offense, and so long as the amendment does not prejudice the substantial rights of the defendant.

As discussed earlier, Kenison's indictment charged him with engaging in a course of conduct "on or about December 7, 2001". Toward the end of Kenison's trial, after the State had introduced the evidence discussed in the preceding section of this opinion (*i.e.*, the history of Kenison's acts of harassment and threats against Mary Ann and her male friends, beginning in August 1998), Judge Wolverton permitted the State to amend the indictment so that it charged Kenison with engaging in a course of conduct "between 1998 and December 7, 2001".

Kenison's attorney objected to this amendment. The defense attorney noted that Kenison was charged with first-degree stalking under the theory that Kenison's course of conduct violated a protective order. The defense attorney further noted that, if the indictment was amended to describe the time period as "between 1998 to December 7, 2001", the jury might convict Kenison for engaging in acts of non-consensual contact during periods of time when there was no protective order in effect.

Judge Wolverton rejected the defense attorney's argument, concluding that it was premised on a misunderstanding of the law. As we explained earlier, Judge Wolverton construed the first-degree stalking statute as requiring the State to prove that at least *one* of Kenison's acts of non-consensual contact violated a protective order. The judge therefore stated that he would allow the indictment to be amended so that it charged Kenison with engaging in a course of conduct "between 1998 and December 7, 2001".

Despite this ruling, the indictment itself was never amended. The State did not issue an amended indictment (*i.e.*, a new charging document); indeed, when Judge Wolverton gave the jurors the instruction that recapitulated the indictment, the judge tracked the original language of the indictment: "that on or about December 7, 2001, at or near Anchorage, in the Third Judicial District, Joel Morris Kenison knowingly engaged in a course of conduct that recklessly placed another in fear of death or physical injury, or in fear of the death or physical injury of a family member, and the conduct was in violation of [a protective] order".

Rather, Judge Wolverton implemented his ruling by altering the wording of the jury instruction that listed the elements of first-degree stalking. In this instruction, Judge Wolverton told the jurors that the State was obliged to prove:

First, that the event in question occurred on or about December 7, 2001, at or near Anchorage, Alaska;

Second, that Joel Morris Kenison knowingly engaged in a course of conduct *between 1998 and December 7, 2001*;

Third, that this course of conduct recklessly placed another person, [Mary Ann Kenison], in actual fear of death or physical injury, or in actual fear of death or physical injury of a family member;[12] and

Fourth, that Joel Morris Kenison recklessly violated a protective order issued under AS 18.66.100 through 18.66.180.

(Added emphasis in the second paragraph.)

(In various conversations with the attorneys, Judge Wolverton explained that he intended this instruction to communicate to the jurors that the State was obliged to prove (1) that on December 7, 2001, Kenison caused Mary Ann to fear death or physical injury, either for herself or a family member, and (2) that Mary Ann's fear on that day was based on Kenison's course of conduct between 1998 and December 7, 2001.)

On appeal, Kenison again challenges Judge Wolverton's decision to allow this amendment of the charge. However, Kenison does not

---

**12.** We have previously criticized the wording used in this third paragraph; *see Cook v. State,* 36 P.3d at 718. However, Kenison does not challenge this portion of the instruction.

renew the objection that he raised in the superior court—the objection that, if the time span was broadened to include all of Kenison's conduct between 1998 and December 2001, the jury might convict Kenison based on acts that were not committed while a protective order was in effect. Instead, Kenison now argues that Judge Wolverton's ruling prejudiced his rights under Evidence Rule 404(b).

Specifically, Kenison asserts that Judge Wolverton's ruling undercut the defense position that all evidence of Kenison's acts prior to May 2001 was irrelevant and unfairly prejudicial. According to Kenison's appellate brief, "[Judge Wolverton's] decision ... transformed [this] evidence from irrelevant to the corpus of the charge", thus "nullif[ying]" the entire defense argument that all these other instances [of Kenison's behavior] were inadmissible Rule 404(b) material".

Kenison's argument ignores the fact that Judge Wolverton made this ruling long *after* he ruled that the State could present the disputed evidence of Kenison's harassment and threats beginning in August 1998. In other words, Judge Wolverton did not amend the wording of the charge in an effort to justify a planned decision about the admissibility of this evidence. Rather, he amended the charge so that it would conform to the evidence that he had earlier admitted.

Moreover, as we explained in the preceding section of this opinion, Judge Wolverton's previous rulings concerning this evidence were correct. The disputed evidence was relevant for non-propensity purposes, and it was therefore not barred by Evidence Rule 404(b)(1). This would remain true even if Judge Wolverton had refused to allow amendment of the indictment, or if the judge had amended the indictment to include only the time period from May 25, 2001 (when the fourth set of protective orders took effect) to December 7, 2001 (Kenison's last acts of non-consensual contact before his arrest).

That being said, we believe that Kenison's *original* objection to Judge Wolverton's ruling was well-founded. Because the jury was told that Kenison's course of conduct could include any acts he committed "between 1998 and December 7, 2001", there was a danger that the jury might convict Kenison based on acts that were committed when there was no protective order in effect. As we explained earlier, the State was required to prove that *all* of the acts of non-consensual contact comprising Kenison's "course of conduct" were committed in violation of a protective order.

However, Kenison does not pursue this argument on appeal. Moreover, even if he had pursued this argument, we would conclude that the error was harmless under the facts of this case.

Although the State presented evidence of Kenison's pattern of harassment and threatening behavior beginning in August 1998, a substantial portion of the State's case focused on Kenison's conduct following the issuance of the fourth set of protective orders on May 25, 2001.

Moreover, Kenison's defense at trial was not based on any purported distinction between his pre-May 2001 conduct and his post-May 2001 conduct, nor was it based on the assertion that Kenison was innocent of any of this conduct. Rather, the defense attorney argued that even though Kenison may have engaged in a lengthy series of non-consensual contacts with Mary Ann and A.B., this conduct did not cause either Mary Ann or A.B. to fear death or physical injury.

The defense attorney told the jury, "Joel Kenison was a nuisance, and nothing more. And [Mary Ann] knew it. [And A.B.] knew it." The defense attorney suggested that Mary Ann and A.B. had become frustrated and fed up with Kenison's behavior, to the point where they decided to press charges and assert—falsely—that Kenison's conduct had caused them to fear death or injury.

Kenison does not suggest, nor is there any indication in the record, that Kenison would have pursued a different defense to the stalking charge if Judge Wolverton had accepted the defense attorney's argument. That is, there is nothing to suggest that Kenison's defense would have been any different if Judge Wolverton had agreed with Kenison that the time period should extend no farther back than May 25, 2001 (the date on which the fourth set of protective orders took effect). Accordingly, even if Judge Wolverton

should have defined the relevant time period as "between May 25, 1991 and December 7, 2001", Kenison was not harmed by this error.[13]

*The trial judge's refusal to declare a mistrial after the prosecutor argued to the jury that Kenison might be convicted of stalking if his conduct caused Mary Ann to fear that Kenison might commit suicide*

■ During her summation to the jury, the prosecutor addressed the State's need to prove that Kenison's conduct caused Mary Ann to fear death or physical injury to herself, or to fear death or physical injury to a "family member". The prosecutor noted that the statutory definition of "family member" was quite broad—that this definition included the people that the victim was dating, and even the victim's former spouse.[14] The prosecutor then suggested to the jury that, in Kenison's case, this element could be satisfied by proof that Mary Ann was afraid that Kenison might kill himself. (There was evidence that, in the months following their breakup in August 1998, Kenison had threatened to commit suicide.)

Kenison's defense attorney immediately objected, arguing that the prosecutor was wrong as a matter of law—and that even if the prosecutor was conceivably correct on this point of law, Kenison had never before received notice that the State was pursuing Kenison's case on this theory. The defense attorney told Judge Wolverton,

> *Defense Attorney:* If [that theory of the offense is] going to be [presented to the jury], I ask for a mistrial so we can be prepared to meet that [theory] as well. Because we didn't even question [Mary Ann] about her [potential] concern about [Kenison], because that was never an issue in this trial. It cannot be an issue now.

Judge Wolverton, too, expressed surprise that the prosecutor was arguing this theory of the law. The judge instructed the prosecutor not to address that point again in front of the jury, and the judge announced that the matter would be taken up at the next break. The prosecutor then proceeded with her argument. She never mentioned this theory again, either in the remainder of her initial summation or in her rebuttal—although she did suggest to the jurors that Kenison's threats of suicide were relevant to the extent that they could explain the reasonableness of Mary Ann's fear that Kenison was becoming unpredictable and that he might hurt her, or their children, or the men she was dating.

When the prosecutor finished her initial summation, Judge Wolverton called a recess, and the parties discussed the issue of whether the offense of stalking might be proved by showing that the perpetrator's course of conduct caused the victim to fear that the perpetrator might commit suicide or otherwise harm themself. Kenison's attorney renewed his objections (1) that the statute did not cover such a situation, and (2) that Kenison had received no notice that the State would be pursuing this theory.

The prosecutor argued that the statute could reasonably be interpreted to cover Kenison's threats of suicide (since he was the victim's former spouse), but the prosecutor stated that she was "willing to not make that argument again". Judge Wolverton replied that he thought the statute could be read as the prosecutor suggested, but Judge Wolverton also ruled that, under the indictment, the issue was Mary Ann's state of mind on December 7, 2001—*i.e.*, whether Mary Ann thought that Kenison was threatening to commit suicide that night.

The judge noted that there was uncontroverted testimony that Kenison had threatened suicide three years before (*i.e.*, shortly after the marital breakup, in the fall of 1998). But when Judge Wolverton wondered aloud whether the prosecutor was going to assert that, on the evening of December 7, 2001, Mary Ann feared that Kenison was going to

---

13. See *Houston v. Anchorage,* 59 P.3d 773, 777–78 (Alaska App.2002), and *Hosier v. State,* 1 P.3d 107, 109 (Alaska App.2000), where we upheld trial judges' decisions to amend charging documents under Criminal Rule 7(e), in large mea-

sure because we were convinced that the amendments had no effect on the defendants' litigation of their cases.

14. AS 11.41.270(b)(2)(D).

commit suicide, the prosecutor responded, "that's not my argument for that day".

The defense attorney then asked Judge Wolverton to instruct the jury that they could not consider Kenison's earlier threat to commit suicide as proof of the "fear of death or injury" element of the offense. Judge Wolverton replied, "You can make your argument [to the jury], and I don't think [that] the State is going to rebut your argument.... [A]s a matter of law, [Kenison's suicide threat] could be [the basis for a fear of death or injury to a family member]. [But] it's a matter of whether [that theory] was factually proved, and the State isn't even asserting that [it was]."

After further comments from the attorneys, Judge Wolverton decided that the matter should be resolved by letting the parties clarify the issue in argument:

> *The Court:* I'm going to leave it to argument. [The prosecutor] is indicating that she's not asserting that that was [Mary Ann's] concern on December 7th. And you [*i.e.,* the defense attorney] can make that clear in your argument. And, apparently, it's not going to be rebutted.

On appeal, Kenison renews his argument that Judge Wolverton should have declared a mistrial after the prosecutor argued that Kenison's threat of suicide could form the basis for Mary Ann's fear of injury or death to a "family member".

Kenison notes that, even after the bench conference we have described, the prosecutor told the jury two more times that Kenison's threat to commit suicide was one of the factors that might reasonably have caused Mary Ann to fear that Kenison was acting unpredictably or uncontrollably. This is true, but the prosecutor's comments were proper.

The transcript reveals that the prosecutor never again argued that Kenison might be convicted based on proof that Mary Ann feared for Kenison's safety on December 7, 2001. Rather, the prosecutor argued that on the evening of December 7, 2001, Mary Ann feared that Kenison might injure her or might injure the man she was dating, A.B.

The prosecutor further argued that Mary Ann's fear was reasonable, based on the whole history of her dealings with Kenison since the marital breakup—including his threat of suicide in 1998.

We conclude that Kenison's threat of suicide was in fact relevant to evaluating the reasonableness of Mary Ann's fear, since it was one factor (among many) indicating that Kenison was distraught over the marital breakup, that he was acting unpredictably or uncontrollably in matters concerning Mary Ann, and that, because of his emotional state, he might hurt her, or their children, or the men she was dating.

■ This is not to say that we endorse the State's position that a person can be convicted of stalking based on proof that the person's conduct caused their former spouse to fear that they might commit suicide. It is true, as the State notes, that the statutory definition of "family member" includes former spouses. However, as we explained in *Petersen v. State,* the gist of the offense of stalking is *assaultive* behavior.[15] We have substantial doubts whether the legislature, when enacting the stalking statutes, intended to have people convicted of this crime based on someone else's fear that they might do violence solely to themselves.

But we need not resolve this issue in Kenison's case. As explained above, after the defense attorney objected to the prosecutor's argument that fear for the safety of a family member might include fear that a former spouse would commit suicide, the prosecutor promised not to repeat that argument—and she kept that promise. All of the prosecutor's ensuing arguments on this topic focused on the assertion that, on December 7, 2001, Mary Ann reasonably feared that Kenison might harm her or that he might harm her boyfriend, A.B. The prosecutor did not return to the contested argument that Kenison could be convicted if Mary Ann feared for *Kenison's* safety.

The defense attorney's arguments to the jury likewise focused on Mary Ann's alleged fear that Kenison would either hurt her or

---

15. *Petersen,* 930 P.2d at 431.

would hurt A.B. As we explained in the preceding section of this opinion, the defense attorney argued that Mary Ann was trying to use the judicial process for fraudulent purposes. The defense attorney suggested that Mary Ann did not actually fear that Kenison would hurt anyone—and that she was falsely saying that she feared for her safety so that she could be rid of Kenison and his annoying behavior.

Given this record, we conclude that Judge Wolverton did not abuse his discretion when he denied the defense attorney's request for a mistrial. In the alternative, we conclude that Kenison has failed to show that he was prejudiced by Judge Wolverton's failure to declare a mistrial.

*The trial judge's refusal to give the jury an instruction further explaining the meaning of "fear"*

During the jury's deliberations, the jurors asked for a definition of the term "fear". After consulting the parties, Judge Wolverton told the jurors:

> Because there is no legal definition of the word "fear" in our statutes, you as a jury are to assign the meaning you collectively believe should be assigned [to this word] according to what you determine to be the common experience of mankind.

Although there is no indication in the record that Kenison's attorney objected to Judge Wolverton's answer to the jury, Kenison now claims that Judge Wolverton should have answered differently—that the judge should have instructed the jurors on the meaning of "fear", and that this instruction should have expressly stated (1) that the victim must actually feel fear, and (2) that this fear must be reasonable.

Because Kenison's claim is raised for the first time on appeal, he must show plain error. Judge Wolverton's answer to the jurors was in fact erroneous, but we conclude that this error did not amount to "plain error". That is, the error did not manifestly prejudice the fairness of the proceedings.

As we explained earlier in this opinion, the stalking statute does not use the word "fear" in its everyday sense. Rather, the statutory phrase "fear of death or physical injury" means that the State must prove that the victim reasonably understood or perceived a threat of death or physical injury.

However, the error in Judge Wolverton's answer favored Kenison. If the jurors employed the everyday definition of fear—*i.e.,* if they required the State to prove that Mary Ann experienced actual "anxiety and agitation caused by the presence or nearness of danger", or "dread", or "terror", or "fright" [16]—this would have put the State to a higher burden of proof than the law actually requires.

We accordingly conclude that the error was harmless.

*Conclusion*

The judgement of the superior court is AFFIRMED.

16. *Webster's New World Dictionary of American*    *English* (Third College Edition, 1988), p. 495.